Filed 3/29/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re C.W., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>HEATHER B.,<br><br>     Defendant and Appellant. | A152993<br><br>(Sonoma County<br>Super. Ct. No. 4203DEP) |

Heather, the mother of a 16-year-old boy, C.W. who entered the child dependency system at age 10, appeals the juvenile court's orders terminating this dependency case and awarding sole legal and physical custody of C.W. to his father, Rusty, who lives in Louisiana. We reverse.

The orders appealed from here were the culmination of a series of rulings by the Sonoma County juvenile court that Heather asks us to review. After it terminated reunification services early for both parents and adopted a permanent plan, the juvenile court returned a minor to the custody of a parent who is an admitted, convicted child sex abuser, failed to reunify with his son, participated in barely any reunification services, engaged in no sexual abuse counseling, and lives on the other side of the continental United States, far away from the watchful eye of even the most conscientious local child welfare officials. This began, without notice, as a "trial home visit" with the boy's father after reunification had already failed. The visit then transformed into a new permanent

1

plan of "family maintenance" with his father, again with no notice or hearing. Regrettably, while living with his father C.W. deteriorated on virtually all fronts, including trouble in school and at home, conflict with his father, sexual misbehavior and ultimately trouble with the law. Eventually, C.W.'s father kicked C.W. out of his own home and sent him to live in a children's group home in Louisiana at the urging of local law enforcement officials. Meanwhile in California, C.W.'s mother felt ready herself to regain custody of C.W., having through her own efforts overcome a pernicious cycle of homelessness and drug addiction and become gainfully employed. But rather than order C.W. returned to California where effective supervision over him could resume, and where his mother pleaded ceaselessly for his return, the juvenile court eventually closed the book on these dependency proceedings. It terminated its jurisdiction over C.W., who by then was still living in the out-of-state group home, and it awarded sole legal and physical custody of the boy to his father—who had not made any demonstrated progress toward overcoming his past behaviors as a child sex abuser or the risk they posed to his son.

While this appeal was pending, C.W.'s father then removed C.W. from the group home after again having been accused of child sexual abuse. Louisiana child protection authorities then removed C.W. on an emergency basis from his father's custody, resulting in a Louisiana dependency court asserting competing jurisdiction over C.W. Eventually, the Louisiana court sent C.W. back to California to live with his mother and very recently it terminated its own case.

We hold, first, that this appeal is not moot in light of these post-judgment developments, because under the Uniform Child Custody Enforcement Act (UCCJEA), California has continuing, exclusive jurisdiction over the permanent disposition to be made concerning C.W.'s custody. On the merits, we hold the juvenile court abused its discretion in awarding custody of C.W. to his father under all of the circumstances (not including those that transpired after the entry of judgment). Accordingly, we will reverse both the custody award entered by the juvenile court and its termination of jurisdiction.

2

# STATUTORY OVERVIEW

This appeal solely concerns rulings made after the juvenile court terminated reunification services for both parents, during the phase of proceedings in which it selected and implemented a permanent plan for C.W. (the "post-reunification" or "permanency planning" phase), which in this case involved, at least initially, continuation in foster care. Before discussing the background of this case, we briefly summarize the legislative scheme governing the post-reunification phase of juvenile dependency proceedings for such children, in order to put the challenged rulings in context.

Although the legislative scheme is somewhat labyrinthine, it is simple in basic concept.[1] Its purpose is to balance efforts to reunify a parent with their child with the child's need for a stable, permanent home. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1015.) "The parent is given a reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority." (*Id.* at pp. 1015–1016.) The critical juncture is when a hearing pursuant to Welfare and Institutions Code section 366.26[2] is set to determine a permanent plan of care for the dependent child, sometimes referred to as the "permanency planning hearing." (See *In re Maria Q.* (2018) 28 Cal.App.5th 577, 593.) "[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over the child's need for stability and permanency." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.) The reunification period may last as long as 18 months, and it may be yet another four months before the section 366.26 hearing is held. (*In re Marilyn H.*, at p. 310.) "While this may not seem a long period of time to an adult, it can be a lifetime to a young child. Childhood does not wait for the parent to become adequate." (*Ibid.*) "After the termination of reunification services, the parents' interest in the care, custody and

---

[1] Because C.W. is a not an Indian child, we omit discussion of requirements pertaining solely to Indian children.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

companionship of the child are no longer paramount.  Rather, at this point, 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption [pending the adoption of a permanent plan] that continued foster care is in the best interests of the child." (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.)  After the focus has shifted from reunification, "[t]he burden . . . is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue." (*In re Marilyn H.*, at p. 309.)  This scheme "provides a means for the court to address a legitimate change of circumstances while protecting the child's need for prompt resolution of his custody status." (*Ibid.*)

In selecting a permanent plan, the statutory preference is for termination of parental rights and adoption, followed in order of priority by several alternatives the last of which (and therefore disfavored) is continued foster care.[3]  (See § 366.26, subds. (b)(1) & (7).)

After the selection of a permanent plan, periodic review hearings must be conducted pursuant to section 366.3.  (*In re Marilyn H*., *supra*, 5 Cal.4th at p. 305.)  If the permanent plan is either for adoption or guardianship, that statute calls for the juvenile court to retain jurisdiction until either step is accomplished, and to review the child's status every six months to ensure that the plan "is completed as expeditiously as possible." (§ 366.3, subd. (a).)  For all other children (i.e., those who have neither been ordered placed for adoption nor with a legal guardian), section 366.3 specifies that "the status of the child shall be reviewed at least every six months" (*id.*, subd. (d)) in order to inquire into "the progress being made to provide a permanent home for the child," which inquiry also "shall consider the safety of the child" (*id.*, subd. (e)).  Subdivision (e) of section 366.3 specifies ten categories of findings that must be made at each review

---

[3]  The other alternatives, in descending order of preference after adoption, are a relative guardianship; a permanent goal of adoption accompanied by up to six months of efforts to locate an adoptive family; nonrelative guardianship; and permanent placement with a relative subject to continuing, periodic juvenile court review.  (§ 366.26, subd. (b).)

4

hearing for such children. Among the required findings, as pertinent here, are determinations concerning "[t]he continuing necessity for, and appropriateness of, the placement" (*id.*, subd. (e)(1)), "[t]he extent of progress the parents or legal guardians have made toward alleviating or mitigating the causes necessitating placement in foster care" (*id.*, subd. (e)(7)), and "[t]he extent of the agency's compliance with the child welfare services case plan in making reasonable efforts either to return the child to the safe home of the parent or to complete whatever steps are necessary to finalize the permanent placement of the child" (*id.*, subd. (e)(4)).

Subdivision (h) of section 366.3 imposes additional requirements at such hearings with respect to children in foster care. Among other things, it directs the court to "*consider all permanency planning options for the child* including whether the child should be returned to the home of the parent, placed for adoption, . . . or appointed a legal guardian, placed with a fit and willing relative, or, if compelling reasons exist for finding that none of the foregoing options are in the best interest of the child and the child is 16 years of age or older, whether the child should be placed in another planned permanent living arrangement." (§ 366.3, subd. (h)(1), italics added.)

Notwithstanding the requirement that the court consider "return home" as a permanent plan option for a child in foster care (§ 366.3, subd. (h)), there is a statutory presumption in favor of continued out-of-home placement rather than efforts to return the child home. Subdivision (f) of section 366.3 states: "[i]t shall be presumed that continued care is in the best interests of the child, unless the parent or parents prove, by a preponderance of the evidence, that *further efforts at reunification are the best alternative for the child.*" (Italics added.) In such cases, the statute permits the court to order "further reunification services to return the child to a *safe* home environment" for up to six months, and family maintenance services "as needed" for an additional six months. (*Ibid.*, italics added.) It also requires a description of "the specific reunification services required to effect the child's return to a safe home" in cases where "the reviewing body determines that a second period of reunification services is in the child's best interests, and that there is a significant likelihood of the child's return to a safe home

5

due to changed circumstances of the parent, pursuant to subdivision (f)." (*Id.*, subd. (e)(4).) "By placing the burden of proof on the parent and focusing exclusively on the child's best interests, section 366.3, subdivision (f) promotes the welfare of the child and avoids interference with permanency planning, while leaving open the possibility of reunification in those rare cases where it might remain the child's best option." (*D.T. v. Superior Court* (2015) 241 Cal.App.4th 1017, 1041.)

The conduct of this case strayed significantly from this framework. Chronic departures by the court from these statutory requirements led almost inevitably to the errors that Heather asks us now to review.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Commencement of This Case, Failed Reunification and the Selection of a Permanent Plan

When C.W. was born in July 2002, his parents, Heather and Rusty, were married. Not long after, his father left both wife and child and eventually moved across the country, to Louisiana.[4] C.W.'s father started a new family there, remarrying and having two more children with his second wife.

After leaving his California family, Rusty had practically no contact with C.W. From approximately age three until age five, C.W. saw his father only three times (once a year), and then once more in July 2009 at age seven. After that, Heather stopped all visits because she found out Rusty had been arrested on aggravated rape charges. According to Rusty, Heather at that point "eliminated me from [C.W.'s] life."

The rape charges that surfaced were not the only accusations of sexual assault Rusty had faced since leaving his California family. In October 2004, before Rusty moved to Louisiana, the four-year-old daughter of a woman he was dating accused him of sexual abuse. The three were living together in Sonoma County. In somewhat lurid

---

[4] The record is unclear precisely how old C.W. was when Rusty left. According to the jurisdiction report, C.W. told a social worker his father had left him when he was six months old. According to notes of a telephone call, Rusty told an agency social worker he moved to Louisiana in 2005, when C.W. would have been a toddler.

detail, the little girl claimed Rusty had touched her vaginal area with his hand on more than one occasion while lying beside her in bed. Police interviewed but did not arrest Rusty, and he denied the accusations. There was no physical corroboration, the investigation was closed and no charges were filed. Then, approximately six years later, in 2009, the 14-year-old niece of Rusty's second wife accused him of raping her at a party. He fled with his family to Florida to avoid jail time, but was arrested and extradited back to Louisiana where he was charged with sex crimes and spent ten months in jail. His wife was arrested in Florida too (as an accessory), and their two children were removed by Florida child protection authorities until the charges against his wife were eventually dismissed. For reasons not apparent in the record, the incident led to rape charges against Rusty concerning yet a third minor, a 17-year-old girl who had recently broken off a sexual relationship with him and reported to police that he showed up at her home and forced himself on her sexually. He eventually pled guilty to two counts of misdemeanor carnal knowledge, although the record is unclear as to which victim(s).[5] Later, when speaking with the Sonoma County child protection authorities in this case, Rusty denied raping the younger teen but admitted having sexual intercourse with the 17-year-old girl and said it had been consensual.

Rusty claimed that after he was released from jail, he tried to contact C.W.'s mother but couldn't locate her (Heather disputed this).

Meanwhile, C.W. was growing up in California, living with his mother who struggled with addiction. Eventually in 2012, she became homeless and was arrested on drug charges. In August of that year, she left C.W., then 10 years old, to live with her own mother and her mother's husband, ostensibly temporarily until she could find a

---

[5] The record is unclear (and in minor respects, conflicting) concerning the precise dates and details of these prior incidents and the charges related to them, and contains only limited documentation from law enforcement agencies and no judicial records of Rusty's criminal prosecution. The facts discussed in the text are taken principally from the contents of the jurisdiction report.

home. While C.W. was living with his grandparents, his mother initially had spotty contact with him and after a few months none at all.

On May 28, 2013, when C.W. was not quite 11 years old, the Sonoma County Human Services Department (the Agency) initiated this case, after learning of C.W. through his grandparents' efforts to initiate guardianship proceedings. It alleged, pursuant to section 300, subdivision (b), that C.W. was at risk due to his mother's substance abuse and, due to his father's "history of sexually inappropriate behaviors," was at substantial risk in his father's care too (§ 300, subd. (d)). The latter allegations were based on the 2004 accusations against Rusty by the four-year-old girl in California, his 2010 arrest in Louisiana for the aggravated rape of a 12-year-old girl, and the rape and sexual battery charges against him concerning the 17-year-old girl.

C.W. wanted contact with his mother and eventually to live with her again, but he "absolutely" didn't want any contact with Rusty, whom he didn't regard as his father and whom he could recall seeing only twice in his life, and whom C.W. recalled as "mean." He did not want to be placed with his father during the dependency and refused even to have visitation.

The court subsequently found true the allegations, declared C.W. a dependent ward of the court, and ordered reunification services. For reasons not apparent, Rusty's case plan did not include any objectives or services designed specifically to address the sustained allegations concerning his history of sexually abusing minors.[6] Heather was permitted to have supervised visitation, but Rusty was not permitted any visitation until C.W. was willing to have contact. C.W. was initially placed with his grandparents, but due to his grandmother's erratic behavior he was later moved to a foster home.

---

[6] The court ordered Rusty to participate in mental health counseling in order to address "parenting and any other issues" Rusty or his therapist identified, take a parenting class, participate in a substance abuse treatment program and a 12-step program, and undergo random drug testing.

8

After six months of reunification services, the Agency recommended terminating reunification services early for both parents and, on February 28, 2014, the court did so and set a permanency planning hearing under section 366.26. Heather had barely engaged in services; was unemployed; still had no stable home of her own; and still struggled with substance abuse. Rusty had had no contact with his 11-year-old son, had ignored the social worker's suggestion he even just start with letters, and had "barely been engaged in [reunification] services."[7] Rusty acknowledged his relationship with C.W. was "practically non-existent." C.W. still had no interest in seeing his father. In terminating services, the court found both parents had made minimal progress toward alleviating or mitigating the causes that necessitated C.W.'s removal, and that returning him to either parent would place him at substantial risk of physical or emotional injury. It ordered that visitation would be "based on the child's needs, which may result in a reduction of visitation." But it authorized Heather to authorize psychotropic medication for C.W., because it found she posed no danger to him. Rusty traveled from Louisiana for the hearing and visited with C.W. for the first time in years.

Two months after services were terminated, in May 2014, C.W. was removed from the home of the foster parents who had expressed interest in adopting him, when it was discovered he had been inappropriately touching a seven-year-old girl who lived there, in a sexual manner. He was placed into a group home.

At the uncontested section 366.26 hearing, which took place on July 23, 2014, shortly after C.W. turned 12, the court selected two somewhat conflicting permanent plans.[8] In one written order, it found that it was likely C.W. *would be adopted*, that termination of parental rights would not be detrimental but that no adoptive parent had

---

[7] For the first five months he had done nothing and then, approximately one month before the originally scheduled date for the six-month review hearing, he started therapy, enrolled in a parenting class, and began a nine-month outpatient substance abuse treatment program. He had not yet begun attending AA meetings, but had begun random drug testing and tested negative for illegal substances three times that month.

[8] No issue has been raised about this irregularity.

9

yet been identified and that C.W. was difficult to place, and so, in accordance with section 366.26, subdivision (c)(3), declined to terminate parental rights and specified adoption as the permanent placement goal. It directed the Agency to endeavor to locate an adoptive family and submit a report in approximately five months, on December 11, 2014. In the second order, the court found C.W. "*is not adoptable* at this time" (italics added) and ordered a permanent plan described as "a planned permanent living arrangement with a confidential placement, and a specific goal of adoption" by July 2, 2015.[9] As matters turned out, neither plan would materialize.

**B. The Three-Year Permanency Phase, Including C.W.'s Strengthening Bond with His Mother While in Foster Care, His Father's Complete Disappearance for a Year, Followed by a Visit to His Father in Louisiana from Which He Never Returned**

The Agency concedes in its respondent's brief that "this case is a bit unorthodox." And from this point forward, it certainly was.

For reasons not apparent from the record, the Agency did not submit any report by the December 11, 2014 deadline concerning efforts to locate an adoptive family, as the court had ordered it to do.[10] And at the first permanency review hearing, on January 15, 2015, again for reasons not apparent, the court adopted proposed findings that the Agency had complied "with the permanent plan of a planned permanent living arrangement with confidential placement, and *a specific goal of a less restrictive foster care setting continues to be appropriate*." (Italics added.) With the adoption of that

---

[9] This confusion appears to have resulted from the Agency's changed position. It had initially recommended a plan of adoption without termination of parental rights because a suitable adoptive home had not yet been identified for C.W., but prior to the hearing it changed its recommendation to a planned permanent living arrangement (PPLA) "with the hope that he can be referred to the adoptions unit once he has received the needed treatment and he is ready for adoptive placement." Citing C.W.'s continued displays of inappropriate and sexualized behaviors in his group home, the Agency reported that C.W. needed "more extensive treatment than could be accomplished in the usual adoption track."

[10] No issue has been raised concerning that omission either.

finding, the previously ordered permanent plans specifying adoption as C.W.'s long-term goal were written out of the case *sub silentio*.[11] At this point, C.W. was no longer living in a group home and had been placed with a foster family.

About a year and a half later, and two years after a permanent plan had been selected, 14-year-old C.W. traveled to Louisiana on July 11, 2016, to visit his father and, as it turned out, would not return. Nothing in the record indicates Heather was told this would happen, or that the court had approved C.W.'s trip before he went.[12] By that point, the only progress Rusty had made toward appropriate parenting had been to recently re-establish contact with his son, after two years of remaining largely absent from his son's life.[13]

On the other hand, C.W. by this point had developed a close and supportive relationship with his mother. The two had developed a "strong bond," Heather's visits had increased measurably, and she had been working supportively with both the Agency and C.W.'s foster parents. For two consecutive review periods, the Agency had consistently described her as "an asset to the treatment plan" for her son and "an essential component to [his] potential for overall success." And C.W. had been thriving in his

---

[11] There was no discussion of this proposed finding or its subject matter at the hearing.

[12] The date of C.W.'s trip did not come to light until seven months later, disclosed in a status report the Agency filed on February 16, 2017. In a status report it filed 11 days before the trip, on June 30, 2016, the Agency reported only that Rusty "has a planned visit for a week in July." It did not specify where the "planned visit" would occur.

[13] For more than a year after the February 2014 hearing terminating services, Rusty had no contact at all with his son. Rusty changed his telephone number and 12-year-old C.W. could not even locate his father during that period, and was so sad he couldn't even talk about it. It wasn't until December 2015, when C.W. was 13, that the Agency reported the two had begun some "intermittent" phone contact, but it was unclear whether C.W. felt their relationship was supportive. Then they had a visit for an extended weekend in January 2016 when Rusty came to California to attend a review hearing, which the Agency said "highlighted a strong bond" and which precipitated renewed phone contact.

prior foster home, both behaviorally and emotionally.[14] By then, he had finished eighth grade, and had "flourish[e]d academically" for much of the year with mostly straight A's (until an unrelated emergency caused a slight disruption when he moved to a new foster family (see footnote 14, *ante*)). And he had been taken off all of his psychotropic medications. The Agency saw no need to change C.W.'s placement; in the status report it filed 11 days before he left for Louisiana, it recommended he remain placed with his new foster parents.

Three days after C.W. began his Louisiana visit, a section 366.3 review hearing took place, on July 14, 2016, during which neither the Agency nor anyone else disclosed C.W. was already in Louisiana. The parties merely discussed an upcoming 16-day "vacation" in Louisiana, which prompted concerns from Heather, but the juvenile court approved the trip after the Agency reassured the court it had conducted a "virtual tour" of Rusty's home. It also ordered that "[f]ollowing proper notice to parties," the Agency was "authorized to begin a trial home visit with the mother and father prior to the next review hearing."[15]

Sixteen days after C.W. went to Louisiana, Heather and her attorney were informed during a court-ordered settlement conference that a new plan was in place (the record does not indicate by whom): starting August 4, C.W. would live with Rusty in Louisiana and attend school there. In a phone message, the Agency's counsel also notified Heather's counsel that the visit "was now a trial home visit" and that C.W. would not be returning to California. There had been no notice or hearing on the change in plan.

---

[14] C.W. had very recently been placed with a new foster family, in May 2016, after a sudden death in the family of his prior foster parents. He was adjusting well and continuing to experience success in his new foster home too.

[15] This was apparently a reference to Sonoma County Superior Court Local Rule 10.26, which authorizes "trial home visits" subject to prior court approval and at least three court days' notice specifying the date the visit is to begin (and, if anyone objects, a separately calendared contested hearing and a ruling before the visit may begin), as well as a hearing to review the visit within 90 days.

12

Subsequently, the court maintained that status quo through inaction. Over Heather's repeated objections, it declined at multiple hearings to order C.W. returned to California. It made no findings that it would be safe to allow him to live with Rusty or that Rusty had taken steps to address his proclivity for sexually abusing minors, there was no evidence to support any such finding, and the court did not even inquire into those subjects. And about seven months into C.W.'s visit, the operating assumption became that C.W.'s permanent plan had changed, to that of remaining in Rusty's home "under a plan of family maintenance," although no orders to that effect were ever entered.[16]

C.W.'s situation, including his relationship with his father, deteriorated badly in Louisiana. He started ninth grade at a local high school but had behavioral problems, got suspended, asked to resume his psychotropic medication and struggled academically. Eventually he was expelled for downloading pornography and then enrolled in an alternative school his father described as a "boot camp." At home, he was having personality clashes with his father, struggling with behavioral issues, and pushing back against Rusty's "strong boundaries and expectations." He also ran away once and was missing for several hours.

---

[16] This assumption originated from a mistake contained in a status report the Agency filed on February 16, 2017, seven months after C.W. arrived in Louisiana. In it, the Agency wrote that C.W. "went to visit his father's home in Louisiana on July 11, 2016, and *following the acceptance of the father's [section 388 petition] to the court, remained in the home on a Trial Home Visit, 'THV' under a plan of family maintenance*." (Italics added.) This was mistaken. Eight days after C.W. went to Louisiana, Rusty had filed a section 388 petition asking that C.W. live with him "on a trial home visit," but at the subsequent hearing on his petition, on August 10, 2016, he asked that his petition be "put in abeyance" because "we pretty much obtained what we were looking for in that the trial home visit has started," the court did not rule on the petition, and at the next court appearance, on October 3, 2016, Rusty formally withdrew it. Heather objected to the supposed plan of "family maintenance" at the next review hearing, on February 23, 2017, and gave notice she would be filing a formal request for a change in the court's (non-existent) order. Subsequently, she filed a section 388 petition asking that C.W. be returned to *her* (again, on a "trial home visit"), contending among other things that Rusty "has not shown that he has addressed the serious issues in his background: domestic violence, and sexual assault."

13

Things eventually, in the words of the Agency's counsel, reached a "boiling point" and "blew up." After several incidents of "sexual acting out" by C.W., Rusty informed Heather that his wife wanted a restraining order against C.W. and that they didn't want C.W. living in their home with their other children.[17] After that, on March 28, 2017, Rusty checked C.W. into a residential treatment program called the Louisiana Methodist Children's Home, paid for by Rusty's insurance. Rusty had reported his son's behavior to local law enforcement officials who investigated, and the juvenile probation department recommended C.W. enter the treatment program. At a hearing conducted the day after C.W. entered the facility (which was already on calendar), Heather's counsel lodged a comprehensive series of objections, but counsel for the Agency reported the social worker had flown to Louisiana on an emergency basis, "vetted" the program, and had concluded "on an emergency kind of basis" that the options for getting C.W. into a treatment program in California were "slim." After that hearing, there were still worsening developments when C.W. revealed in therapy that he had sexually molested his younger half-sister while living with his father, and also had "acted out" sexually toward unnamed "disabled adults." Criminal proceedings were initiated, but eventually local law enforcement officials decided not to pursue the charges.

All of this culminated at a contested hearing on September 8, 2017, approximately six months after C.W. had been expelled from Rusty's home and more than a year after C.W. had left California. By this juncture, the Agency was recommending the case be terminated, with orders that C.W. continue to remain under his father's care and custody. Also pending was a section 388 petition Heather had filed six months earlier, asking the court to return C.W. to her on a trial home visit. (See footnote 16, *ante*.)

---

[17] C.W. had been found watching sexually explicit material and asked a friend to download sexually explicit material for him after his father had installed a firewall. In addition, he had made "graphic sexual comments and a sexual proposition" to a younger brother. He also was found in possession of other people's belongings (his younger sister's and a neighbor's).

### C. Dismissal of the Dependency Case in September 2017, with Sole Custody Awarded to C.W.'s Father

The court opened the final hearing by framing the issue, initially, as a decision on where C.W. should live if the case were to be dismissed. With the issue thus framed, C.W.'s lawyer opposed dismissal. C.W. didn't want to live with his father and wanted to be returned to his mother yet, according to counsel, "there needs to be some mechanism or something that forces that removal from dad into mom's home full time." In addition, his counsel expressed safety concerns because Heather "hasn't had the requisite contact with him." The Agency urged dismissal, contending C.W. had been "legally placed" with Rusty already, there were no changed circumstances that would justify now removing C.W. from the treatment program and placing him with Heather, and "services are being provided by [Rusty] to ameliorate the issues that the family is currently experiencing." Rusty's counsel contended the dependency proceedings themselves were imperiling C.W.'s welfare. Judicial oversight, counsel maintained, was "stalling" C.W.'s treatment progress because his providers had encountered difficulty securing treatment authorizations when Heather, Rusty and CPS had been unable to agree.

The court next invited argument by Heather's counsel, and then summarily denied her section 388 petition in a colloquy reflecting some confusion:

"[Mother's counsel]: Your Honor, I'm not sure if this is opening statement on the [section 388 petition] or on the dismissal but—

"THE COURT: Well, again, the case is on today, really, should the Court grant a hearing, an evidentiary hearing on the [section 388 petition]? [¶] So—it is your motion.

"[Mother's counsel]: Correct. And that was filed back in March.

"THE COURT: Right.

"[Mother's counsel]: And I think the request is still there; mother is requesting essentially a trial home visit. Given what's happened since March, I think the request for a trial home visit would be to take place when [C.W.] is finished with his treatment in Louisiana and then at that point she would step in and take care of him on a trial home visit. [¶] The overlapping issue of dismissal then is—if the case is dismissed, the

15

argument is mother should have custody rather than father? And we have this unusual situation where it's called family maintenance right now, but [C.W.] is really in the care and custody of Louisiana Methodist Children's Home. So if the case is dismissed, it seems like it's right now a strange situation to have—I guess in anticipating [C.W.'s] exiting from this children's home, she would be requesting custody of him at that time.

"THE COURT: But as it's framed right now, wouldn't the motion really be, should the Court remove the child from his current therapeutic placement and place him in the home of the mother; . . . is that not the request?

"[Mother's counsel]: Based on what was filed back in March, I think he was in the care of father at that time and she was requesting that the care be transferred to her.

"THE COURT: At the present time, given the child's placement, the Court does not believe that there has been a sufficient showing to justify an evidentiary hearing on the [section 388 petition]. So that request is denied."

The court then solicited opening statements on what it characterized as the Agency's "motion to dismiss" the case. Rusty's counsel argued, again, in favor of dismissal on the theory that Heather had been interfering with C.W.'s treatment and "had not been compliant" with his treating clinicians. Heather's counsel argued there was still a substantial risk of harm to C.W. if the case were dismissed, because he was not yet done with treatment. He also argued Heather very much wanted to be involved in his treatment and had tried to be, but had been blocked. And, he argued that Heather was ready and willing to take care of C.W. when he finished the program and asked that he be returned to California. The court then shared lengthy comments equating the propriety of either retaining or terminating jurisdiction with the question whether either parent could now "help fix the child."[18] After these comments, the Agency and C.W.'s counsel both

---

[18] Specifically, the court said this: "Well, there is no legal requirement that any existing problem be fixed, only that a parent is in a position to deal with, to support, to treat, . . . [the] condition. [¶] The idea being if you had a child who has Lupus and the parent initially isn't providing treatment and isn't taking the child to doctor's appointments, if through reunification services, followed by family maintenance services

16

submitted without introducing any evidence, other than stipulating to the admission of a letter from C.W. to his mother (in lieu of his live testimony) reflecting that he missed her, wanted to be with her, and didn't want to be in his father's custody. The court inquired whether Heather's counsel wanted to introduce any evidence on the dismissal issue and, after a brief pause, her counsel said he agreed dismissal is appropriate, "leaving open the issue of custody." The court then announced that its "tentative" position was to dismiss the case, "but . . . I now must move into what should the exit custody orders look like."

That final hearing phase began with the arguments of counsel. Rusty requested sole legal and physical custody, with only supervised visitation for Heather, in a manner to be determined by C.W.'s treating physicians. The Agency concurred, but was open to unsupervised visitation "if it's therapeutically appropriate." Heather asked for physical and legal custody of C.W. after he finished his treatment at the children's home, with visitation "as appropriate" for Rusty. Barring that, she objected to supervised visitation for her and to conditioning her visitation on a treating physician's approval. C.W.'s counsel declined to take a position, struggling with the conundrum that "there is no way to split the baby in this case" and not yet wanting the case dismissed.[19]

---

the parent comes into a position of understanding the nature of the disease, the need for ongoing treatment, and is stepping up to the place, taking the child to doctors' appointments, seeing that the course of treatment is done at home, I mean, at some point in time we dismiss the case even though the child is not yet cured. [¶] So that's kind of what we're looking at here today. The child doesn't have to be fixed. The parent just has to be in a position to continue to help fix the child. And if the parent's in a position to help fix the child, there's no reason for us to stay involved. We have children who have lifelong complications who will never be fixed, but we dismiss the dependency proceedings because the parent's in a position to care for the child and there's no longer that risk."

[19] His counsel wrestled openly with the fact that C.W. at different times had expressed an interest in living with each of his parents, though he presently wanted nothing to do with Rusty and wanted to live with Heather. However, C.W.'s counsel didn't want the case dismissed at that juncture with an award of custody to Heather, because she hadn't yet been involved in C.W.'s current treatment and the court needed feedback about her ability to do that.

Three witnesses then testified, all called by Heather.

***Carmel Papworth-Barnum.***  A social worker with an outside homeless advocacy organization, Carmel Papworth-Barnum, who had worked with Heather for the past year to help her find housing, testified that Heather had found a new job, and a two-bedroom unit with a year-long lease that was just waiting for inspections to finalize.  She described Heather as "a delight" to work with, and "a determined and persistent person" who "doesn't give up," despite the obstacles of having a Section 8 voucher in a tight Sonoma County housing market.

***Social Worker Sydney Ferris.***  Next to testify was Sydney Ferris, the Agency's social worker who had been assigned to the case in December 2016, approximately five months after C.W. arrived in Louisiana.  According to Ferris (and contrary to the Agency's legal position), the Agency had *not* definitively decided it would be best for C.W. to return to his father.  She also testified, vaguely, that Louisiana child protective services had begun investigating Rusty but had closed their case, although there was a possibility they would step in if the juvenile court dismissed the case in California.  Ferris also testified that C.W. had told her (twice, as recently as their last contact in July) that he didn't feel safe in his father's home, didn't want to live with his father whom he said needed anger management, had seen Rusty use a belt on some of his other children, and recently left a therapy session with his father after only eight minutes.  She also testified there had "definitely" been breaks in C.W.'s family therapy with his father and stepmother, "due to the fact that [C.W.] was not interested and that there was this ongoing investigation."

Ferris testified that the only way in which Heather had tried to block any of C.W.'s treatment was by once declining to consent to some psychotropic medication that his doctors had approved for him.  Ferris explained Heather was upset when she found out that she hadn't been consulted in advance about it and that Rusty had approved it, since she was the one who held the rights to approve C.W.'s psychotropic medication.  According to Ferris, Heather was upset with the treatment program (for not consulting with her); Rusty was upset with Heather (for not approving it); and the treatment program

18

"was upset that they were having to jump through so many hurdles" to get the medication approved.

Ferris also described various ways in which Heather's access to her son had been curtailed since he had begun living in the children's home. Heather hadn't been allowed to participate in family therapy because C.W.'s treatment team was focused first on family therapy with Rusty, "because that's who he was planning to return home with." Heather was not allowed to call her son, and was allowed to have phone calls from him only if supervised. Yet she had one supervised visit with C.W. in January that went very well, where they spent time together enjoying New Orleans and were both "very happy" to see each other, and nothing inappropriate took place. She wanted to visit him again in March but the Agency wasn't willing to pay for it.

Ferris also testified briefly about the measures the Agency had taken to find a suitable facility in California for C.W. It applied to one facility in California that would not accept C.W., to another in Nevada and contacted the state to ask about other facilities that focused on the kinds of behaviors C.W. was exhibiting. Once the Louisiana Methodist Children's Home accepted C.W., the Agency stopped its search.

*Heather.* Heather testified about dramatic changes she had made in her life since the case began. She was working full-time as an accounting clerk at a local auto body shop, with full pay and medical insurance, and she also had a second job working part-time as an in-home health aid. She had been clean and sober for two years, after having successfully completed a drug treatment program. In addition, all drug offenses against her had been dismissed; she had been released from probation early; and she was eligible to seek expungement of the two criminal charges that remained on her record. She also didn't think there was any danger of relapse: she didn't want to do anything to compromise her relationship with her son, and she believed that if anything would trigger a relapse it would have been "the very significant emotional trauma" she had endured in the case, and yet despite those stresses she had remained clean and sober. She had gone to counseling, where she gained "a lot of insight . . . and some better understanding of myself and my own behaviors as well as . . . the mistakes that I made as a parent."

19

Heather had partial custody of her younger, eight-year-old son, who lived with her one night a week and also was picked up from school by her daily. Her younger son had grown up with C.W. until he was about two and a half. But it had been more than two years since the brothers had had any contact, and nearly three since they had visited together.

Heather testified about her involvement in C.W.'s life before he went to Louisiana, including regular unsupervised overnight weekend visits, a two-week visit together when she cared for him without incident, and her efforts to work closely with his foster parents for nearly a year ("they were really great people"). She testified, "I did my best to be as involved and supportive to them and to him while he was in their care."

She also addressed concerns about C.W.'s behaviors. Right around the time their overnight visits began, it came to light C.W. had been accessing pornography. She testified he never did that when he visited with her, and she had no hints he was engaged in any sexual behaviors with one exception. In the spring of 2016, the social worker (Ferris' predecessor) invited her to attend a school conference with C.W.'s foster parents because of "an incident surrounding inappropriate touching in school." Heather became very upset and had to excuse herself from the meeting, because she felt the social worker was shaming C.W., talking in front of him as if he were a sexual predator.

Heather also testified about how her contact with C.W. declined once he went to Louisiana. After having enjoyed regular unsupervised, overnight visits with C.W. while he was in California, she had only infrequent phone contact with him once he began living with Rusty because the calls were required to be monitored, which puzzled her. Asked why she didn't call her son more frequently, she explained that she had been "blindsided" by what had occurred in the case, didn't understand why things took the turn that they did or why her calls had to be supervised, and was just frustrated and "struggling" to come to grips with everything. When she tried raising her concerns about supervised phone calls with the social worker, the social worker refused to address the subject. She also tried to contact C.W. through his Facebook account but got no

20

responses; she had no idea why, but assumed it was because their contacts through social media were being monitored.

Heather also testified about the difficulties she'd encountered trying to be involved in C.W.'s treatment in Louisiana. She asked several times to be allowed to participate in family counseling with her son, but she was told the program would need to request the Agency's approval and then nothing came of it. She also had reached out several times just asking for information about her son's progress; eventually she was promised monthly written status reports, but she received only two and then the reports stopped. She also made clear, repeatedly, to her primary point of contact in C.W.'s program that she was available to offer any support they thought was appropriate. Yet despite her many attempts to be involved, she felt her relationship with her son wasn't being acknowledged or supported while he was in Louisiana.

She denied ever blocking C.W.'s treatment in the program, including with respect to medications. She testified she had worked with C.W.'s doctors to get him medication when needed ever since C.W. was five years old, and "I have never been against him taking medication." She was simply opposed to "not being notified of him even taking medication until that decision was already made," a problem that she testified was reflective more generally of her being excluded from his treatment. As for the prospect of C.W. coming back to California, Heather testified she was "absolutely" willing to get C.W. whatever treatment or follow-up counseling he might need, and could pay for it either personally or through her employer-sponsored insurance.

Heather had written her son only three times since he entered the program and had received just one letter back until the previous day when C.W. emailed her, reiterating what he said in his letter that was introduced into evidence: that he missed her and wanted to live with her. Asked why she hadn't written him more often, she testified that she had wanted more contact but was at a loss for an explanation, in part because of the long gaps in him writing her back as well as the constraints the program had placed on her. As she put it, "I feel like I've gotten conflicting information, and I really don't know

21

how to be there for him." She also testified she had wanted to visit him more often, but couldn't afford to and also couldn't risk taking time off from her new job.

Asked why she thought it wasn't in her son's interest to return to his father, she testified that C.W. wanted to be with her not Rusty, and "obviously, it's not working," citing for example his expulsion from school, running away and "all of these behaviors" that were happening while in his father's care. "Obviously . . . there's a problem, and perhaps we need to, you know, value his opinion or maybe look at it." She also testified she didn't think it was necessary for her to have supervised contact with C.W., and still didn't understand why that had occurred.

Asked why she thought it was in her son's best interest to live with her once he finished his treatment program, she testified in her own words, poignantly, that it was because she believed she had overcome the problems that led the court to declare her son a dependent of the court: "I honestly feel like [C.W.] was never removed from my custody for me abusing him in any way. I struggled with substance abuse and had placed him in the care of my mother and that's how the case originated. There has never been any modeling [*sic*] of my parent to be able to say that I can't parent or to say that I can't—and I just feel that I should be allowed the opportunity to try to parent my child. [¶] I mean, I've turned my life around and—I'm aware of, you know, his needs as much as I can be or as much as I've been made aware of and I completely want to parent my child and offer him whatever support he needs and be a part of his life."

After entertaining brief argument, the court ruled from the bench that Rusty would be awarded full custody of C.W. It also suggested, initially at least, the matter should be revisited later. Here is what it said (italics added):

"[A]t this point in time the Court does . . . not believe that joint physical custody is appropriate and I do believe, given the state of the evidence right now, custody to father is appropriate. [¶] So any *order that I issue today is subject to review. Once your son is done with treatment, then that will be a change in circumstance, we'll see where that is*. My job is to determine where your son should be today, with what parent. You know, I believe the current placement with your child in the program he's in is appropriate.

22

"[HEATHER]: I do too.

"THE COURT: And I believe that the father being right there is in a better position to run that. *When he's out of treatment, then it'll be up to the Court to determine what's the next step*. [¶] My job today is to figure out what today's step is. I don't have a crystal ball. As things change and develop, as he completes the program, that's going to be a different situation; we'll see where he is mentally."

The court then directed the parties to meet and confer about visitation, and when the parties went back on the record to announce they'd reached an agreement, another colloquy ensued in which the court again indicated the disposition was not intended to be permanent (italics added):

"[HEATHER'S COUNSEL]: I guess the one issue that kind of gets to me is, I mean, Children's Home has custody of [C.W.] and it seems like that should be reflected in the court order. Right now it's like this fiction that dad has custody when he doesn't.

"THE COURT: Well, *he legally has legal and physical custody of the child. The child is in placement*. I mean, as I mentioned, *the next step is what happens when he gets out?* [¶] So if you want to write in there that there's an agreement that there be a re-assessment upon contemplation of his graduation or expulsion. I mean, I think that's—as I said, I can't crystal-ball what's going to happen. *I can't make orders today that would encompass that event*. But as you look today, he needs to be somewhere and no one's disagreeing that this is a bad place or—this is meeting his needs currently. So I'm fine with that language." (Italics added.)

When Rusty then asked whether "jurisdiction" for reassessing custody would be in California or Louisiana, the court offered some final comments that were inconsistent with its previous remarks and also reflected a puzzling view of its own supervisory role: "Under the Uniform Code, we're looking at where is the child's home state? The home state of the child is where has the child been living for six months before the Court is being asked or where does the child have a strong connection? Although, the connection has been here, that would be a conversation that if there's a controversy between the parents that a Louisiana judge would have with a Sonoma County judge. [¶] Now, again,

23

*when I said should be reviewed, I mean, that doesn't mean it has to be reviewed by a judge. It should be reviewed by mom and dad. If mom and dad at that review come up with an agreement—that's why I say 'should' rather than 'shall be' reviewed by a judge, because the more the two of you agree, the better it goes. I mean, you two are experts on this child. The child is yours. So if you can work out the details between the two of you, that's always better*." (Italics added.)

The court then announced that it was signing findings and orders, and the parties waived their reading. The court entered written findings the Agency had "complied with the case plan by making reasonable efforts and taking whatever steps necessary to finalize the child's permanent plan," the permanent plan "to remain home is appropriate," and "the conditions which existed within the family that justified the original assumption of jurisdiction no longer exist." It entered two written orders dismissing the case, without qualification. And it entered a custody order awarding sole legal and physical custody of C.W. to Rusty, with four limitations: "1. Mother to have phone calls as arranged through therapist. [C.W.] to call when he wants. 2. Mother may write letters as often as she wants. 3. Mother to have visits in Louisiana as she is able, and as therapeutically driven. 4. Parties agree that issues be reassessed upon graduation or expulsion from Louisiana Methodist Children's Home."

Heather then timely appealed the court's orders.

**D. Subsequent Events**

In November 2017, the month after the court terminated its jurisdiction, and while C.W. was still living in the residential treatment program, Louisiana child protective services removed Rusty's other two children from his custody due to physical abuse, and he was ordered to have no contact with them. Then, in December 2017, Rusty was arrested for two counts of sexual battery involving his wife's nine-year-old daughter. He was released from jail on bond the following month, in mid-January 2018, on the condition he not return to his home, and after his release from jail he removed C.W. from the residential treatment facility.

Then, in April 2018, seven months after the court terminated jurisdiction and while this appeal was pending, Louisiana child protective services removed C.W. from his father's custody on an emergency basis. Subsequently, in July 2018, the Louisiana courts continued C.W. in the custody of the Louisiana Department of Children and Family Services and ordered reunification services for both parents.

We were apprised of these post-judgment developments in a motion to dismiss this appeal (discussed below), and thereafter we contacted the Louisiana court in writing in order to apprise it of this appeal and the fact that there were parallel dependency proceedings concerning the same minor in our courts. We informed the Louisiana dependency court that the parties to this appeal had briefed the question of our subject matter jurisdiction under the UCCJEA, and that we did not intend to make a final determination on that issue until after the parties had an opportunity to address the matter further in oral argument. We also requested supplemental briefing on a number of subjects. Subsequently, in November 2018, the Louisiana dependency court ordered C.W. returned to California to reside in his mother's home, and in January 2019 it terminated dependency proceedings, accompanied by an order granting Heather custody of C.W.

## DISCUSSION

## I.

### *Summary of the Parties' Positions*

Heather challenges several rulings, on many grounds. She contends the juvenile court erred: (1) by allowing C.W. to live in Louisiana with his father on a "trial home visit"—which she contends was done improperly without notice, without any ruling on her objections and without any judicial review after 90 days, all in contravention of the court's own local rules (see Super. Ct. Sonoma County Local Rules, rule 10.26); (2) by later deeming that visit to become a "family maintenance" placement—which she contends on many grounds was done improperly, in violation of section 386 without

notice,[20] in violation of the statutorily mandated standards and procedures under section 366.3, subdivision (f) for potentially returning a child to a parent's home during the permanency phase, without any findings that were required to be made under section 366.3, subdivision (e) at the periodic review hearings to ensure C.W.'s safety, and without any statutorily mandated oversight in the way of family maintenance services or even a case plan (see § 16506, subd. (c); § 16501, subds. (a)(2) & (g); § 366.3, subd. (e)(4)); Cal. Rules of Court, rule 5.740(b)(1), b(2); *id*., rule 5.708(e)); (3) by allowing C.W. thereafter to be placed into the residential treatment program in Louisiana—which she contends was done improperly without the filing of a supplemental petition under section 387[21] or compliance with the Interstate Compact on the Placement of Children (see Fam. Code, § 7900 et seq.; *id.*, § 7911.1), and also in violation of section 361.21 which requires a determination that "[i]n-state facilities or programs [are] unavailable or inadequate to meet the needs of the minor" before a dependent child is placed in an out-of-state group home (§ 361.21, subd. (a)(3)); and (4) by dismissing jurisdiction and awarding sole custody of C.W. to his father, a result she says was an abuse of discretion and unsupported by substantial evidence. She also challenges the visitation order on the ground the court improperly delegated its authority to determine her visitation rights to C.W.'s therapists. Recognizing that she did not file separate appeals earlier to challenge the first three sets of claimed errors (and, did not

---

[20] That provision states: "No order changing, modifying, or setting aside a previous order of the juvenile court shall be made either in chambers, or otherwise, unless prior notice of the application therefor has been given by the judge or the clerk of the court to the social worker and to the child's counsel of record, or, if there is no counsel of record, to the child and his or her parent or guardian."

[21] That statute, which governs an "order changing or modifying a previous order by removing a child from the physical custody of a parent . . . and directing placement in a foster home, or commitment to a private or county institution," requires the filing of a supplemental petition by the social worker alleging "facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child," and a noticed hearing within 30 days. (§ 387, subds. (a), (b) & (d).)

object to several of them), Heather argues that those rulings exceed the court's jurisdiction, and as such are void and may be challenged at any time.

C.W. joins in his mother's argument that the court erred in dismissing jurisdiction, and maintains the court should have retained jurisdiction until he finished his treatment program in Louisiana so that he could have then been returned to his mother's custody in California per his wishes. In response to our request for supplemental briefing, he stated that if we reverse the dismissal of jurisdiction, then the question whether the juvenile court should maintain continuing jurisdiction after his return to his mother in California should be left to the juvenile court to decide in the first instance based on current circumstances.

The Agency, for its part, initially asked us to dismiss this appeal as moot or, alternatively, to affirm the juvenile court's rulings. It initially defended all of the court's rulings on the merits, and also argued Heather waived many of her arguments and failed timely to appeal from appropriate rulings in various ways. And its mootness argument, presented in an initial motion to dismiss this appeal, was premised on the theory that Louisiana's assertion of jurisdiction over C.W. while this appeal was pending deprived this court of subject matter jurisdiction over C.W. under the UCCJEA (Fam. Code, § 3421), and so this court is unable to grant any effective relief. In response to our request for supplemental briefing, however, the Agency retracted its mootness argument and conceded California has exclusive continuing jurisdiction over C.W. and that the Louisiana court, in effect, merely exercised temporary emergency jurisdiction as it was permitted to do. It also conceded that this case presents exceptional circumstances and that evidence of post-judgment developments in Louisiana completely undermine the legal underpinnings of the juvenile court's orders, and was willing to stipulate to reversal once the Louisiana court returned C.W. to his mother's custody. And, in supplemental briefing at first it stated that "if the Louisiana dependency court finds that it is in [C.W.'s] best interests to return to mother's care and determines he is safe enough in her care to terminate the dependency case, there may not be a legal basis under the California Welfare & Institutions Code to continue dependency proceedings in California" (citing

27

§ 300) and suggested the parties address the current circumstances on remand to determine if continued supervision is necessary. After the Louisiana court returned C.W. to California and terminated proceedings, the Agency filed a second motion to dismiss this appeal arguing once again the appeal is moot.

As matters now stand, father is the only party who argues in favor of allowing the juvenile court's orders to stand.[22] He joins fully in the Agency's (now largely disavowed) respondent's brief and also in the Agency's initial motion to dismiss this appeal which, as said, was premised on an interpretation of the UCCJEA the Agency now concedes is wrong. He also contends this appeal would be moot if the Louisiana court terminated its case and granted Heather sole physical custody.

---

[22] He came late to this appeal, having not been notified of it by the superior court clerk as required. (See Cal. Rules of Court, rule 8.405(b)(1)(A).) Once the superior court clerk's error came to light after the close of briefing by the other parties, we gave him notice of the appeal, appointed him counsel and solicited written briefing from him.

28

## II.

### *Mootness and the UCCJEA*

Although some of the issues in this appeal now are clearly moot in light of C.W.'s return to his mother's custody in California, the appeal in its entirety is not moot.[23] That is because of our conclusion, as now conceded by virtually everyone in this case, that under the UCCJEA California has continuing, exclusive jurisdiction over C.W. despite the Louisiana court's intervention while this appeal was pending. With the filing of this opinion we will be simultaneously communicating with the Louisiana court in order to clarify this.

The UCCJEA is the exclusive method for determining subject matter jurisdiction for child custody proceedings in California, including child dependency proceedings. (*In re E.R.* (2018) 28 Cal.App.5th 74, 79.) It " 'takes a strict "first in time" approach to jurisdiction.' [Citation.] In general, once the court of an 'appropriate state' . . . has made a child custody determination, 'that court obtains "exclusive, continuing jurisdiction . . . ." ' " (*W.M. v. V.A.* (2018) 30 Cal.App.5th 64, 72.) "The purposes of the UCCJEA are 'to avoid jurisdictional competition between states or countries, promote interstate cooperation, avoid relitigation of another state's or country's custody decisions and facilitate enforcement of another state's or country's custody decrees." (*Schneer v. Llaurado* (2015) 242 Cal.App.4th 1276, 1287.)

Family Code section 3421, subdivision (a) specifies the circumstances in which California courts have jurisdiction to make an "initial child custody determination." (See Fam. Code, § 3421, subd. (a); *id.*, § 3424 [exception for temporary emergency jurisdiction].) A " '[c]hild custody determination' means a judgment, decree, or other

---

[23] Even if we had jurisdiction to disturb orders encompassing such rulings despite Heather's failure to timely appeal them (a point we need not decide), we cannot afford any effective relief with respect to the court's decision to allow C.W. initially to return to his father's physical custody and to remain there over Heather's continuing objections, and C.W.'s subsequent placement at the children's group home in Louisiana, because those circumstances have ended.

order of a court providing for the legal custody, physical custody, or visitation with respect to a child," including "a permanent, temporary, initial, and modification order." (*Id.*, §3402, subd. (c).) And " '[i]nitial determination' means the first child custody determination concerning a particular child." (*Id.*, subd. (h.) Once a California court makes an initial custody determination under section 3421, the California court has "exclusive, continuing jurisdiction over the determination" under Family Code section 3422, subdivision (a), subject to certain exceptions not relevant here.[24] (See *id.*, § 3422, subd. (a).)

In this case, the juvenile court made an initial custody determination governed by the UCCJEA,[25] and it had jurisdiction under Family Code section 3421 to do so because "on the date of the commencement of the proceeding," California was C.W.'s "home state" (Fam. Code, §3421, subd. (a)(1)), a status that confers California with the highest possible jurisdictional priority. (See *Schneer v. Llaurado*, *supra*, 242 Cal.App.4th at

---

[24] One exception is if a court of *any* state determines that neither the child nor his parents presently reside in California (Fam. Code, § 3422, subd. (a)(2)), but that exception does not apply here because Heather resides in California. The other exception is if "[a] court of *this* state determines that neither the child, nor the child and one parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships." (*Id.*, § 3422, subd. (a)(1), italics added.) As we have previously explained, "The statute unambiguously gives the decree state [initially asserting jurisdiction] sole power to decide whether jurisdiction has been lost on this basis." (*In re Marriage of Nurie* (2009) 176 Cal.App.4th 478, 510.) No California court has made such a determination, no party has asked this court to do so, and C.W.'s return to California would appear to defy any application of this exception. Finally, even if a California court has exclusive jurisdiction under the UCCJEA, it has discretion to decide that another state is a more convenient forum. (See *R.B. v. D.R.* (20018) 28 Cal.App.5th 108, 118.) No party has raised this issue either, and we have no occasion to address it.

[25] Any or all of the custody awards entered in this case, beginning with the temporary detention order that placed C.W. with his grandmother and culminating with the court's final exit custody orders, qualified as such because no other court had ever before made a custody determination concerning C.W. (See Fam. Code, § 3402, subds. (c) & (h).)

30

p. 1287 ["The UCCJEA prioritizes home state jurisdiction over other bases of jurisdiction"]; Fam. Code, § 3421, subd. (a)(1).) Specifically, a child's "home state" is defined as including "the state in which a child lived with a parent or person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." (Fam. Code, § 3402, subd. (g).) Here, it is undisputed C.W. had lived his entire life in California at the time these proceedings were commenced, and so California clearly qualifies as his home state for purposes of initial custody jurisdiction under the UCCJEA. And because the juvenile court made an initial custody determination concerning C.W., it had, and continues to have, continuing, exclusive jurisdiction over his custody pursuant to section 3422.

None of this is to say that Louisiana did not properly assert its jurisdiction in the circumstances of this case. The UCCJEA, which Louisiana also has adopted (La. Rev. Stat., § 13.1801 et seq.), provides for the exercise of temporary emergency jurisdiction to protect a child present within a state's jurisdiction when "necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." (*Id.*, § 13.1816, subd. (A).) And that is how we construe what took place in this case. Under the UCCJEA, however, including as adopted by Louisiana, the Louisiana court must recognize and enforce the California juvenile court's custody determination (see La. Rev. Stat., § 13.1825, subd. (A); Fam. Code, §§ 3443, 3453), and also is prohibited from modifying it (other than for purposes of exercising its temporary emergency jurisdiction) because no exception permitting modification applies (no California court has determined that it no longer has exclusive, continuing jurisdiction or that Louisiana would be a more convenient forum (see footnote 24, *ante*), and Heather still lives in California). (See La. Rev. Stat., § 13.1815; Fam. Code, § 3423.)[26] A court exercising temporary emergency jurisdiction under the

---

[26] Due to a lack of communication initially between our courts until this court contacted the Louisiana court after being apprised of those proceedings, it is unclear exactly how matters evolved as they did. It is possible the Louisiana court mistook our

31

UCCJEA cannot exercise jurisdiction to determine a child's permanent custody in the face of a competing foreign custody award enforceable under the UCCJEA if, as is the case here, the issuing state has not ceded its continuing jurisdiction. (See *In re Joseph D.* (1993) 19 Cal.App.4th 678, 689–696 [construing predecessor statutory scheme]; *In re C.T.* (2002) 100 Cal.App.4th 101, 112–114 [juvenile court properly terminated emergency jurisdiction after consulting with state court that issued initial custody order and asserted its jurisdiction]; *In re Gino C.* (2014) 224 Cal.App.4th 959, 965–966 ["temporary emergency jurisdiction does not confer authority to make a permanent custody determination"]; *In re Aiden L.* (2017) 16 Cal.App.5th 508, 517, fn. 5 [same]; cf. *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 311 fn. 5 [distinguishing *Joseph D.* where no prior custody award existed when California asserted emergency jurisdiction]; *In re Angel L.* (2008) 159 Cal.App.4th 1127, 1138 [same]; *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1175–1176 [remanding to determine if prior custody award by Saudi Arabian court is enforceable under UCCJEA].) Appellate courts are obligated to "enforce California custody judgments made by a court with jurisdiction under the

---

juvenile court's decision to terminate jurisdiction as an indication the juvenile court declined to exercise jurisdiction under the UCCJEA. (See La. Rev. Stat., § 13.1813, subd. (A)(2).) But the Louisiana court did not contact the juvenile court as it was required to do (see *id.*, § 13.1816, subd. (D)), and the California juvenile court's custody orders provided notice the juvenile court "has jurisdiction to make child custody orders in this case under the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, §§ 3400–3465)." Furthermore, even if Louisiana were regarded as C.W.'s home state under the UCCJEA by the time the Louisiana case was commenced (because he had lived there with his father for at least the preceding six months (see La. Rev. Stat, § 13.1802, subd. (7)(a)), no custody orders issued by the Louisiana court would qualify as an "initial custody determination" for purposes of conferring that court with exclusive, continuing jurisdiction under the UCCJEA, because the juvenile court of our state had already issued an initial custody determination by the time the Louisiana court commenced proceedings (see footnote 25, *ante*). (See La. Rev. Stat., §§ 13.1802, subd. (8) ["initial determination"]; *id.*, § 13.1813, subd. (A)(1) [initial custody jurisdiction by home state]; *id.*, § 13.1814 [exclusive, continuing jurisdiction].)

32

[UCCJEA] despite the assertion [by a court in another jurisdiction], after the entry of the custody order, of concurrent jurisdiction." (*In re Stephanie M.*, at p. 313.)

Because California courts have continuing, exclusive jurisdiction over C.W., we have subject matter jurisdiction over this appeal and the power to afford effective relief. The appeal is not moot. Despite C.W.'s return to Heather's custody by order of the Louisiana court, only a court of California has jurisdiction to decide issues affecting his permanent legal custody, and presently the California juvenile court has vested permanent legal custody with his father. We now proceed to address these issues as they have been framed in the context of this appeal.

## III.

### *The Trial Court's Custody Decision*

This is a procedurally messy, factually complicated case. But it is not very hard. Although the parties have raised many issues, and many claims of error by Heather give us significant pause and raise troubling concerns, we do not need to decide most of the issues the parties have briefed in view of the most significant, overriding reason to reverse: the award of sole legal custody of C.W. to his father.

The court's exit custody order was issued pursuant to section 362.4, which empowers the juvenile court, if it terminates its jurisdiction over a dependent minor, to issue "an order determining the custody of, or visitation with, the child." (§ 362.4, subd. (a).) If there is a pending marital or paternity proceeding relating to the child, the custody order will be transferred to the existing family court file. (See *id.*, subd. (b).) Otherwise, the order may be used to open a new file in the superior court of the county in which the parent who has been given custody resides. (See *id.*, subd. (c).) The order shall continue "until modified or terminated by a subsequent order of the superior court." (*Id.*, subd. (b).)

We review a juvenile court's decision to terminate jurisdiction and to issue an accompanying exit custody order for abuse of discretion, and may not disturb such rulings unless the court made an " ' " 'arbitrary, capricious or patently absurd determination.' " ' " (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

Preliminarily, we note the juvenile court's written orders are inconsistent with its oral pronouncements at the September 8, 2017 hearing. Its written orders suggest that it intended the placement with Rusty to be permanent because it also dismissed jurisdiction, yet its comments at the hearing suggest a temporary custody award, subject to re-examination. (See *In re Karla C.* (2010) 186 Cal.App.4th 1236, 1259, fn. 9 [noting a similar conflict between oral and written orders, and that "The Courts of Appeal have reached differing conclusions regarding which order controls when a juvenile court's oral pronouncements differ from its written order"].) It is unnecessary to decide which orders control, however, because the court abused its discretion either way.

We start with the court's finding that "the conditions which existed within the family that justified the original assumption of jurisdiction no longer exist," which is not supported by substantial evidence with respect to Rusty.[27] In June 2013, the court sustained allegations C.W. was in substantial danger in Rusty's custody due to Rusty's history of sexually inappropriate behaviors toward three other minors (§ 300, subd. (d)), and it found on clear and convincing evidence that C.W. could not safely reside with Rusty, who presented a substantial danger to both his physical and emotional welfare. The parties have cited no evidence Rusty ever received services or treatment of any kind to address his sexually inappropriate behavior toward children, or other evidence demonstrating Rusty's past history no longer posed a risk to his son. That alone disposes of the point and should have compelled a contrary finding by the juvenile court, and we could stop there. And yet there is more, because the record affirmatively shows C.W. was still at risk in his father's care because, sadly, some of the danger materialized (at least insofar as his emotional welfare was concerned). Beginning with his expulsion from school for downloading pornography, then engaging in sexual behavior at home that was so troubling his stepmother had wanted a restraining order, and culminating with revelations he had been sexually molesting his younger half-sister, C.W.'s own behavior

---

[27] We requested supplemental briefing on this issue.

34

worsened while living with his father to the point he ended up engaging in the very kinds of behavior for which his father had been criminally prosecuted. Simply put, Judge Ornell's finding, in the face of these facts, that the conditions that justified the original assumption of jurisdiction—in effect, an implied finding that Rusty no longer posed a danger to C.W.'s physical or emotional well-being—is baffling.

Awarding sole custody of C.W. to his father in these circumstances was an abuse of discretion. After reunification has failed, a permanent plan has been selected and the focus of proceedings has shifted from reunifying parent with child in favor of providing the child with a permanent and stable home, it thwarts the entire point of our dependency scheme for a juvenile court to surrender a child back to such a parent, by relinquishing its jurisdiction and awarding that parent full and exclusive legal custody of the child. "It is a clear abuse of discretion to make findings that a minor is at risk in [a parent's] home, yet return the minor home and terminate supervision and dependency." (*In re I.G.* (2014) 226 Cal.App.4th 380, 387.) Doing so abrogates the court's statutory duty to protect every minor within its jurisdiction, wherever placed. (See *id.* at pp. 387–388 [reversing order granting mother custody and terminating jurisdiction]; §§ 300, 300.2; cf. *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2006) 145 Cal.App.4th 692, 699 [abuse of discretion to permit adjudicated child sex abuser to return to family home subject to monitored visitation after finding substantial danger still exists]; see also, e.g., *In re Elizabeth G.* (1988) 205 Cal.App.3d 1327, 1333 [juvenile court properly declined at section 366.3 review hearing to return child to parents who presented no evidence demonstrating any change in their "inability to recognize and admit the problems that required [their daughter's] removal from their home"].) Here, by sustaining the jurisdictional allegations, the juvenile court found early on in the proceedings that C.W. was at substantial risk in his father's care. Thereafter, no evidence was presented Rusty no longer posed a danger *and* there were warning signs of significant problems related to Rusty's unfitness as a parent. By awarding permanent custody to Rusty in these circumstances (if that was the intent), the juvenile court just ignored the risks it previously found existed.

Even if the juvenile court's intent was that its custody award was temporary, lasting only until C.W. completed his treatment in Louisiana, it was still an abuse of discretion, for several reasons. As held by authority cited by Heather, the juvenile court acts in a manner that is internally inconsistent, and lacking in statutory authority, to find that a child is at risk in a parent's custody and yet order the child placed with that parent even temporarily, which is "the equivalent of an in-home dependency" and is not permitted. (*In re Damonte A*. (1997) 57 Cal.App.4th 894, 900 [disposition order]; accord, *Savannah B. v. Superior Court* (2000) 81 Cal.App.4th 158, 162; *In re Andres G*. (1998) 64 Cal.App.4th 476, 481.) Furthermore, a temporary award of custody, if that was the juvenile court's intent, was also arbitrary, because the dismissal order left the juvenile court with no mechanism to reassess C.W.'s custody. We agree with C.W.'s appellate counsel who puts it this way: "Given that the court obviously intended, by the very language of its [custody] order, that a reassessment of [C.W.'s] living situation would take place once [C.W.] finished treatment, its order dismissing jurisdiction was unreasonable and internally contradictory," and no judge could reasonably have made the order. (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)[28]

---

[28] Although no party has raised the point, we recognize that there is a mechanism in *family court* for modifying exit custody orders issued by a juvenile court, but it does not cure the problem. That is pursuant to subdivision (b) of section 362.4, which states that "[a]ny order issued pursuant to this section shall continue until modified or terminated by a subsequent order of the superior court." (§ 362.4, subd. (b); see also *In re Chantal* (1996) 13 Cal.4th 196, 200–201 [explaining distinction between "juvenile court," which is "a superior court exercising limited jurisdiction arising under juvenile law," and "family court," which "refers to the activities of one or more superior court judicial officers who handle litigation arising under the Family Code . . . [and] is not a separate court with special jurisdiction, but is instead the superior court performing one of its general duties"]). That provision does not displace, and must be read in conjunction with, those provisions of juvenile court law that impose a continuing duty on the *juvenile court* to protect a child at risk. (See, e.g., § 300.2; § 302, subd. (c); § 366.3, subd. (e); § 390.) As our Supreme Court has explained, "[t]he two courts have separate purposes. The family court is established to provide parents a forum in which to resolve, inter alia, private issues relating to the custody of and visitation with children. In that setting, parents are presumed to be fit and capable of raising their children. [Citation.]

Finally, regardless whether the custody award here was intended to be permanent or temporary, the error in the court's determination, in effect, that C.W.'s best interests were served by awarding legal custody of C.W. to his father is compounded by the fact that his mother was ready, willing and, by all accounts, able to safely care for him, having dramatically turned her life around in a manner that is consistent with the goals of our dependency scheme. As to *Heather*, the juvenile court's finding that "the conditions which existed within the family that justified the original assumption of jurisdiction no longer exist" is unchallenged in this appeal, and we have no basis to question it. Heather does not challenge the court's ruling at the start of the September 8, 2017 hearing denying her an evidentiary hearing on her modification petition requesting that C.W. be

The juvenile court, by contrast, provides the state a forum to 'restrict parental behavior regarding children, . . . and . . . to remove children from the custody of their parents or guardians.' [Citation.] When, as in this matter, a juvenile court hears a dependency case under section 300 of the Welfare and Institutions Code, the court deals with children who have been seriously abused, abandoned, or neglected. The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child. [Citation.] Accordingly, although both courts focus on the best interests of the child, '[t]he presumption of parental fitness that underlies custody law in the family court . . . does not apply to dependency cases' decided in the juvenile court." (*In re Chantal*, at p. 201; see also *id*. at p. 208.) Furthermore, the hurdle is high for the family court to change an exit custody order issued by the juvenile court: there must be a "significant change of circumstances" and modification must be in the child's best interests. (§ 302, subd. (d).) "Once an exit order is in place, ' "the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining" that custody arrangement.' " (*Heidi S. v. David H*. (2016) 1 Cal.App.5th 1150, 1165.) The family court's limited power to modify juvenile court exit custody orders upon a "significant change in circumstances" is no substitute for the juvenile court's duty to provide ongoing dependency oversight where continued supervision is necessary for a child's protection. (See, e.g., *In re I.G.*, *supra*, 226 Cal.App.4th at p. 386 [juvenile court has a ' "continuing responsibility to account for the welfare of a dependent child under its jurisdiction wherever placed, unless and until a permanent and stable home is established' "].) By issuing a "temporary" exit custody order for a dependent child, intended by design to be re-examined at some future date, the juvenile court improperly surrenders its parens patriae responsibilities.

returned to her on a trial home visit, although we note our concerns with that ruling. (See, e.g., *In re Aljamie D.* (2000) 84 Cal.App.4th 424 [reversing in similar circumstances]; *In re Kimberly F.* (1997) 56 Cal.App.4th 519.) For purposes here, it suffices to note that Heather's circumstances relative to Rusty's put her on considerably stronger footing as a candidate for securing custody of their son. And then, of course, there was 15-year-old C.W. himself, who didn't want to live with his father anymore and wanted to return to California to live with his mother. Although his preference is not determinative, it is "powerful demonstrative evidence" that this would be in his best interest. (*Aljamie D.*, at p. 432.)

In light of all of these circumstances (and as now effectively conceded by the Agency), it was a clear abuse of discretion to award custody of C.W. to Rusty. Simply put, it is difficult to fathom the court's willingness to permit Rusty to have custody of C.W., when Rusty had done nothing to rectify the dangers he posed as a parent, his relationship with C.W. had soured, C.W.'s mother had vastly improved her own parenting capabilities yet had been permitted ever diminishing contact with her son, and C.W.'s own behavior and emotional health had deteriorated so badly in Rusty's care that he ended up banished from his father's household and in trouble with the law.

In light of our conclusion the court erred in awarding custody to Rusty, it is unnecessary to consider separately whether the court erred by terminating its jurisdiction, a ruling that on its face gives us pause. It necessarily follows from our decision on the custody question that the court's termination of jurisdiction must also be reversed, because the two rulings are interwoven and connected. (See *Estate of McDill* (1975) 14 Cal.3d 831, 840; *Marriage of Rosan* (1972) 24 Cal.App.3d 885, 899.) An appellate court " 'must have power to do that which justice requires and may extend its reversal as far as may be deemed necessary to accomplish that end.' " (*McDill*, at p. 840.)

That said, we would be remiss if we did not state the obvious. Heather assured the juvenile court years ago, shortly before it terminated her reunification services and at a time when she was still struggling with addiction, that "I will do whatever it takes to become the mother [C.W.] needs and once had," and "I don't want it to be this way nor

do I want to see my child adopted and loose [*sic*] my privilege of being his mother." On the record before us, it appears she fulfilled that promise. Nevertheless, we leave it to the juvenile court on remand to decide that question for itself based on current circumstances, consistent with the views expressed in this opinion.

## DISPOSITION

Both motions to dismiss this appeal are denied. The requests encompassed within those motions to take judicial notice of records from the Louisiana dependency court proceedings are granted. The juvenile court's orders terminating jurisdiction and related exit orders awarding sole custody of C.W. to Rusty are reversed, and the case is remanded for further proceedings consistent with this opinion. The clerk of this court is directed to send a copy of this opinion immediately upon its filing to the clerk of the Louisiana juvenile dependency court.

_____

STEWART, J.

We concur.

_____

RICHMAN, Acting P.J.

_____

MILLER, J.

*In re C. W.* (A152993)

Trial Court:   Sonoma County Superior Court

Trial Judge:   Hon. Lawrence E. Ornell

Counsel:

Karen Elcaness, under appointment by the Court of Appeal, for Defendant and Appellant.

Bruce D. Goldstein, County Counsel, Rachel M. Bavis, Deputy County Counsel, for Plaintiff and Respondent Sonoma County Department of Human Services.

Nicole Williams, under appointment by the Court of Appeal, for Respondent Father.

Deborah Dentler, under appointment by the Court of Appeal, for Minor.