Filed 6/14/22

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | H049676<br>(Santa Cruz County<br>Super. Ct. No. 18JU00208) |
| SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>G.B.,<br><br>    Defendant and Appellant. | |


On August 31, 2018, the Santa Cruz County Human Services Department (the Department) filed a juvenile dependency petition under Welfare and Institutions Code section 361, subdivision (c) concerning a girl, A.B. (the minor), who was then 11 years old.[1] The minor had been residing with her father, G.B., when the petition was filed. The whereabouts of the minor's mother, A.E., were unknown when the petition was filed. It was alleged that father had physically abused the minor in August 2018 and had physically and emotionally abused her in the recent past. The juvenile court ordered the minor detained, and in November 2018, it found the allegations of the petition, as amended, true under section 300, subdivisions (b)(1) and (c), and adjudged the minor a

---

[1] All further statutory references are to the Welfare and Institutions Code.

dependent of the court.  Father received family reunification services for approximately 17 months.

In September 2020, the court found legal guardianship with the minor's maternal grandparents to be the appropriate permanent plan at the selection and implementation hearing pursuant to section 366.26 (366.26 hearing).  At the hearing, the court found that visitation of the minor by father would be detrimental, and it denied visitation and ordered that father have no contact with the minor.  Thereafter, father requested visitation of the minor.  On May 5, 2021, after a contested six-month post-permanency review hearing in which the court heard testimony from three witnesses, it reaffirmed the detriment finding and denied visitation.  Father renewed his request for visitation at the 12-month post-permanency review hearing on November 30, 2021.  The Department opposed the request and asked that father present an offer of proof to justify a second contested hearing on visitation.  The juvenile court denied father's request for a contested hearing, reaffirmed the detriment order, and denied father's request for visitation.

Father argues that the denial of a contested hearing on his request for visitation violated his statutory right to participate in post-permanency review proceedings and his constitutional right to due process.  After reviewing the language of section 366.3 and the history of legislative amendments to that statute, we hold that father, as the parent of a child where the permanent plan is legal guardianship, did not have an unqualified statutory right to a contested post-permanency review hearing.  We conclude further that father did not have an unfettered due process right to such a contested post-permanency review hearing, and the juvenile court did not err in requiring him to make an offer of proof in support of his request for that hearing.  Accordingly, finding no error, we will affirm the court's order after the 12-month post-permanency review hearing.

2

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. Petitions

In August 2018, the minor reported that father had punched her leg with a closed fist, had scratched her arm, and had struck her head. The minor had a bruise on her leg and a scar on her arm. She also reported that father had physically abused her on prior occasions and had made negative comments to her, including threatening her, yelling profanity at her approximately five times per week, and blaming her for difficulty in his interpersonal relationships. The minor was sad and withdrawn, had pulled out her hair due to stress, and had stated a fear that father would kill her.

On August 31, 2018, the Department filed a petition as to the minor under section 300. On September 4, 2018, the juvenile court ordered the minor detained and ordered supervised visitation a minimum of one time per week for father.

The Department filed first and second amended petitions under section 300, subdivisions (a) [serious physical harm], (b)(1) [failure to protect], and (c) [serious emotional damage]. In addition to the allegations concerning father's treatment of the child, the Department alleged that mother abused substances including alcohol and cocaine, and that she was aware of father's harmful conduct to the minor.

### B. Jurisdiction/Disposition Reports

#### 1. *Family history and prior referrals in Alaska*

A court in Alaska in 2012 awarded father sole legal custody and primary physical custody of the minor, and mother was granted visitation.

---

[2] There have been several prior appeals and writ proceedings in this dependency case. At the minor's request in this appeal, we have taken judicial notice of the record in case No. H049078. At the Department's request in this appeal, we have taken judicial notice of the record in case Nos. H046437, H046828, and H047115. The factual and procedural history through November 7, 2018, presented here are taken from our opinion in *In re A.B.* H046437, June 6, 2019 [nonpub. opn.], of which we have taken judicial notice.

Between 2007 and 2016, there were 11 referrals in Alaska for child abuse and/or neglect. One referral involved a September 2016 incident of alleged child abuse by father at a hotel. Hotel security provided police with a video of the incident showing father upset with the minor because she had not brushed her hair. Father told the minor that if she did not take care of her hair, he would have her head shaved. He also told her that he would beat her if she did not come over to him. It appeared from the video that father struck the minor's face or head. Father denied that he had slapped or struck the minor but said he had "swatted at her face" when she talked back to him. The officer did not observe any injuries on the minor's face. She stated that she felt safe at home, and that she was only talked to, not spanked, when she was in trouble. The report of physical abuse was found not substantiated.

### 2. *The minor's disclosures in California*

In 2018, while in school in California, the minor appeared " 'shut down' and 'sad.' " On August 29, the minor was placed into protective custody after she disclosed at school that father had been physically abusive for the past three years. The most recent incident occurred that morning when he yanked her hair and hit her head hard. She also had a bruise on her leg from being hit the week prior. The minor, crying, indicated that father blamed her for his former wife and the minor's half-sibling leaving him. When the social worker informed the minor that she would not have to go home with father, she let out an audible and visible sigh of relief.

The minor was interviewed by a Santa Cruz County sheriff's deputy and a social worker that same day. She disclosed that father had been hitting her for three years after her half-sibling was born. He usually hit her on the leg about two times a week. Father hit her on the head frequently because it would not leave a mark. The leg bruise from the week prior resulted from his striking her hard once or twice with a closed fist. A few weeks prior, he intentionally scratched her, leaving a scar. Father also yelled profanity at her about five times per week and used a lot of profanity when speaking about mother.

4

The minor had not seen mother in years, and father's negative talk about mother hurt the minor's feelings. When the social worker asked about returning home, the minor's stress level increased. She asked if she had to go home and stated that father was "going to mess" with her and "kill" her. The minor said she did not feel safe at home with father.

Father told the social worker and a sheriff's deputy by telephone that the minor had been fighting with him and was "oppositional." He denied ever hitting the minor. When asked about the bruise on the minor's leg, he indicated that it may have come from riding a bike or climbing on rocks. Father stated that the minor " 'did this before' " because she was jealous of his intimate partners. He said the minor had been acting up because his current girlfriend had been spending more time with them. He reported that his ex-wife (the mother of the child's younger half sibling) had left him because of the minor.

When the social worker discussed relative or non-relative placement options, father stated, "She did this to herself," and the child would have to deal with going into foster care.

### 3. Father's supervised visits/phone contacts

The social worker gave father the phone number for the foster home where the minor was living. Father was told to keep his conversations with the child neutral and to not discuss the case. The Department was required to restrict and monitor father's phone calls because he did not respect the minor's verbal boundaries. The minor told father not to talk negatively about mother, but he continued to bring up past allegations against mother. Prior to the dependency proceedings, father called mother names and told the minor that mother was probably dead. The foster mother reported that the minor had cried when she learned that her mother was alive.

During supervised visits, father often spoke negatively about the minor's mother, the Department, and the case. During one supervised visit in September 2018, the minor told father that she had talked to mother by phone the previous night. The minor was

5

upset with father because, according to mother, she had been trying to get in contact with the minor over the years. Father stated that he hadn't heard from mother since he obtained custody of the child, and he expressed concern about mother's having contact with the minor. The visit supervisor told father to talk to the social worker about his concerns and to refrain from making certain comments during the visit. Father continued to express concern about the minor having contact with mother.

The pattern of father's making critical comments about mother, expressing concern about her having contact with the minor, making negative comments about the Department and its social workers, and threatening lawsuits, continued throughout September and October 2018 during multiple supervised visitation sessions and other contacts. Father repeatedly disregarded the requests of visit supervisors to refrain from inappropriate comments in front of the minor. The Department also expressed concern that father was attempting in text messages and unmonitored phone calls to manipulate the minor and to encourage her to recant her statements that led to the filing of the petition.

### 4. Interviews with mother and other family members

Mother reported to the Department that her relationship with father began when she was 17 and he was 29 years old. Father physically abused her and told her he knew martial arts and could hurt her without leaving a mark. Mother stated she was in a "constant battle" with father to maintain a relationship with the minor. At some point, father would not take mother's telephone calls during scheduled contact with the minor. Father told mother that the minor did not want to speak to her.

Mother admitted she had drug and alcohol problems. She indicated that she had last used cocaine in 2017, and she had stopped drinking regularly in 2017. Mother indicated that she was not yet stable enough to care for the minor.

6

The maternal grandparents described father as " 'very controlling' " and that he would use the minor "as a tool against everyone."  Father would not take phone calls from mother who sought to speak with the minor.

The minor has three paternal half siblings—two older and one younger.  According to Alaska court records, the mother of the two older half siblings had sole legal custody and primary physical custody.

Father's ex-wife, who was the mother of the minor's younger half sibling, dissolved her marriage with father in 2017 and was granted sole legal and physical custody of the half sibling.  In December 2017, the ex-wife obtained a three-year domestic violence restraining order against father.

The ex-wife reported that she had known the minor and father since the minor was three years old.  Father would not answer the phone when the minor's mother tried to speak with the minor pursuant to court-ordered phone contact.  He also regularly talked disparagingly about mother in front of the minor.  Father was verbally abusive to the ex-wife and to the minor.  Father yelled at the minor a lot, told her that she was " 'terrible,' " and called her a " 'bitch.' "  He slapped the minor across the face regularly and "[swung] his hand at her."  The ex-wife had been the main point of contact for the minor's schools because father would become mad and had frequent conflicts with school staff.  The ex-wife left father because of his behavior, not because of the minor.

### 5. *Father's Contacts with Department and Foster Family*

The Department reported that it had attempted to engage father in safety planning around the minor's physical and emotional well-being.  Father's responses included blaming the social worker for harassing him and accusing the social worker of unprofessional behavior.  Father also blamed the minor for being placed into foster care, stating, " 'She did this to herself . . . .' "  After the Department located mother and put her in contact with the child for the first time in years, father texted messages to the minor's foster family threatening legal action if the family allowed the minor to talk with mother

on the phone.  The Department instructed father not to discuss the case with the foster family and not to disparage mother to the child, but he continued to do so.

### C.     Jurisdiction/Disposition Hearing (November 2018)

After a contested jurisdiction/disposition hearing on October 29 and November 7, 2018, the juvenile court found true the allegations in the second amended petition under section 300, subdivision (b)(1) and (c); it did not find true the allegations under subdivision (a).  The court adjudged the minor a dependent of the court, ordered her removed from father's physical custody, found that placement with mother, the noncustodial parent, would be detrimental to the minor, and ordered reunification services and visitation for both parents.  Father's case plan included participating in an anger management assessment and any recommended treatment, participating in therapy, and participating in a psychological evaluation and following all recommendations. In making these findings and orders, the juvenile court found credible the minor's statements to social workers and found not credible the minor's retraction of those statements at the hearing.

### D.     Six-Month Review Hearing (June 2019)

As of April 2019, the minor had changed placements four times.  Three placement changes had been the result of caregivers being unable to manage successfully the minor's behavior, leading to an assessment that the minor needed a higher level of care.  She was living at that time at Chamberlain's Children's Center in Hollister (Chamberlain's).  The minor was attending a local school and had an Independent Education Plan (IEP) with emotional disturbance as a primary disability.  It was reported by the school psychologist that father had not cooperated in providing information necessary for an accurate IEP assessment.

Father had visited the minor consistently, and his visits had increased to 1.5 hours in length.  He had, however, used the GPS feature on the minor's phone to locate her and to appear at unscheduled times insisting on visitation.  There had been incidents in the

past where law enforcement had been called to intercede. During visits with the minor at Chamberlain's, father often brought food that he prepared for the minor. In April 2019, it had been reported that after a visit, father had left an ice chest that included a container of cannabis-infused butter; law enforcement was contacted.[3] Also that month, Chamberlain's advised the Department that father could no longer visit there because of his belligerent treatment of staff and the harm caused to the minor by her witnessing the encounters.

On June 21, 2019, after a two-day contested six-month review hearing, the juvenile court ordered that the minor continue as a dependent child of the court, with the parents continuing to receive services. The court suspended further telephone calls between father and the minor until father was able to demonstrate that he understood that certain negative behaviors were detrimental and interfered with the minor's ability to stabilize her mental health.[4]

### E. Twelve-Month Review Hearing (December 2019)

As of October 2019, the minor was placed at Promesa STRTP (Short Term Residential Treatment Program; Promesa) in Fresno.[5] The minor had refused to attend school and had missed 41 of 43 school days. Father, the holder of the minor's

---

[3] Father's ex-wife advised the Department that he had told her he used cannabis-infused butter when he cooked for the minor because it calmed her.

[4] Father's negative behaviors included discussing (1) dependency allegations and other court matters, (2) the minor's proposed testimony and her statements to others about court matters and the allegations, (3) the minor's past or current placements in negative terms, (4) his planned litigation in response to the dependency proceedings, (5) his beliefs that the minor had been kidnapped or needed to be rescued, (6) that there were ongoing investigations by the FBI and CIA, and (7) mother and her relatives in a derogatory manner.

[5] In July 2019, Chamberlain's (one of the minor's previous placements) had advised the Department that it could no longer provide service to the minor. A representative of the facility indicated that the decision was due to father's behavior, namely that "the amount of anger that [he] display[ed] [was] beyond what [it was] willing to accept as healthy and safe for [its] clients and [s]taff members."

educational rights, had told the minor "the County must send her to her school of origin [in Santa Cruz County] and . . . [no one could] make her go to any school she [didn't] [want] to attend." After he received a School Attendance Review Board notice, father contacted the school district but did not discuss the minor's education, instead stating "that the County [was] holding [the minor] hostage." Father did not lend assistance in attempting to persuade the minor to attend school. The Department recommended an order that the parents no longer hold the minor's educational rights.

Promesa noted that there were both positive and negative aspects of father's visits. Father prepared meals for the minor and brought her snacks, and their relationship appeared to "have a loving foundation." Negative aspects included father's criticism of the Department, discussion of the dependency proceedings, swearing at, and having an aggressive attitude toward Promesa staff, and telling the visit supervisor that the minor did not have to attend school because she had the right to go to school in Santa Cruz County.

On December 2, 2019, after a contested 12-month review hearing, the court ordered that (1) the minor continue as a dependent child in out-of-home placement, (2) father's services continue, (3) mother's services be terminated, (4) the parents' rights to make educational decisions be limited, and (5) the Clovis Unified School District be appointed the minor's educational representative.

### F.     Eighteen-Month Review Hearing (March 2020)

The Department reported that as of February 2020, the minor continued to refuse to attend school. The minor had a reenrollment appointment scheduled for January 23, 2020. When Promesa staff reminded the minor and father about the appointment, father advised that he would not be attending, and the minor said she would not attend without her father. She later said she was disappointed because she had wanted to attend the meeting, but that " 'she could not and that she ha[d] to listen to her dad.' "

10

The minor also refused to attend medical and dental appointments.  Father had specifically instructed the minor during a supervised phone call in January 2020 not to attend them.

On approximately 20 occasions between December 12, 2019 and February 10, 2020, the new social worker attempted unsuccessfully to reach father by e-mail, text, and telephone to schedule a face-to-face meeting.

Visitation logs from Promesa disclosed a pattern in which during visitation, father berated and attacked the staff, accused Promesa of kidnapping the minor and holding her illegally, threatened litigation, recorded visitation over the staff's objection, interfered with supervision of the visits, and discussed the dependency proceedings.  In an addendum report, the Department reported that since its report of February 13, 2020, "the quality of contact between [father] and [the minor] have become increasingly more worrisome, and [father] has displayed increasingly more aggressive behavior while in the presence of [the minor] that appears to impact her emotionally."

On March 18, 2020, after with a contested 18-month review hearing, the juvenile court, inter alia, ordered that father's services be terminated, he receive supervised visitation a minimum of once per month (with the additional terms and conditions governing father's behavior during visitation), he be allowed one weekly, 10-minute, supervised telephone call with the minor, and that a 366.26 hearing be set for July 7, 2020.

**G.      Selection and Implementation Hearing (§ 366.26) (September 2020)**

The minor made inquiry to the Department about being placed with her maternal grandparents in Alaska.  The maternal grandparents participated in and were approved an Interstate Compact for the Placement of Children (ICPC) home study from Alaska.  On June 2, 2020, the maternal grandmother flew to San Jose, met with the minor, and the two flew home together to Alaska the next day.

11

A 366.26 hearing occurred on July 7, 2020. At the hearing, the court ordered that father have visitation with the minor once a month for one hour, telephonically only, and supervised by a person approved by the Department.[6]

At the continued 366.26 hearing on September 29, 2020, the Department changed the permanent plan recommendation from adoption to legal guardianship. The court found that the permanent plan of legal guardianship was appropriate and appointed the maternal grandparents as the minor's legal guardians. It found by clear and convincing evidence that termination of parental rights would be detrimental to the minor, stating that the minor, who was 12 years or older, objected to termination of parental rights. Additionally, the court found that visitation by father would be detrimental to the minor and it was therefore denied. It ordered that father stay at least 300 yards away from the home of the maternal grandparents and have no contact in any way with the minor. Letters of guardianship appointing the maternal grandparents as guardians of the minor were issued by the clerk of the court on November 10, 2020.

### H.    Six-Month Post-Permanency Planning Review Hearing (May 2021)

The Department reported in March 2021 that overall, things had gone well in the minor's placement with her maternal grandparents in Alaska. The minor and her teacher advised the case worker that the minor was doing very well in school. The minor had had no contact with father during the reporting period; the caregivers advised the Department that the minor did not wish to have contact with him.

---

[6] Based upon the Department's application alleging father's prior harassment and threats of county personnel and his current harassment, intimidation and threats by text message to the maternal grandmother, the court issued a temporary restraining order (TRO) on May 19, 2020, with the maternal grandmother and the minor as protected persons. At the July 7 hearing, the court dissolved the TRO but incorporated its terms into the visitation order. It was indicated in a subsequent order of September 29, 2020, that father's visitation rights were terminated on July 24, 2020.

At the initial post-permanency planning review hearing on March 23, 2021, the juvenile court stated that father—who the court noted had not appeared in any proceedings for one year and four months—had submitted an e-mail the night before the hearing requesting custody and that legal proceedings be transferred to Alaska. The court continued the case for a contested hearing on the issue of visitation and the prior finding that visitation by father would be detrimental to the minor.

In its report, the Department opposed visitation. The Department recited, inter alia, father's "history of being uncooperative with visit supervisors, including verbally undermining them in front of [the minor]"; his "minimal engagement in his case plan"; his expulsion from anger management class; his termination from individual therapy; his failure to provide information showing he had "ameliorated any of the issues which brought his family before this Court"; and that father's presence at the March 23, 2021 hearing had had a negative impact upon the minor's subsequent school attendance and her emotional well-being. It was the Department's position that before supervised visitation could begin, father needed to (1) be involved in counseling and parenting classes, (2) provide releases to the Department allowing it to speak with service providers; (3) "demonstrate an awareness of [the minor's] needs and past trauma, and how his behavior caused her harm," and (4) show his "ability to cooperate with visit supervisors, social workers and other service providers."

At the continued hearing on May 5, 2021, the court heard evidence concerning father's request for visitation. Testimony was presented by father, the minor (who was then 14 years old), and Tammy Hull.

Hull testified that she is father's fiancée. The home where Hull and father lived in Alaska had a room ready and available for the minor. There were horses and a waterfall on the property.

Father testified that the minor was in his care from 2010 until her detention in 2018. He was regular in his visitation with the minor and she enjoyed the visits. He last

13

visited the minor in person in Fresno approximately one year and three months earlier. Father testified that he wanted to resume visitation with the minor because he loved her and missed her. He stated: "My property needs to be returned. She was taken." Father stated that he would accept visitation that was supervised, although "[the visits] don't need to be supervised, she's 14."

The minor testified in chambers outside the presence of father pursuant to section 350, subdivisions (b)(1) and (b)(3). On brief examination by father's counsel, the minor testified that she was open to visiting with father and would agree to restrictions on such visitation that might be place by the court. She also indicated that "[she] could do that" in response to whether she would like to talk to father by phone. After the court granted the minor's request to speak without examination by counsel, she testified that father's statement that "[his] property ha[d] been taken away from [him] . . . made me very mad. That's how he treats me. It shows he's not a stable father in that—it just made me mad because I'm not a piece of property and I never will be. . . . [¶] And also how he speaks to me and how he speaks to me and my siblings is—I actually don't want any part of living with him, which I know is totally out of the question." The minor also stated she felt father was "try[ing] to bribe [her]" to regain custody, which she found "just repulsive."

The juvenile court ordered the minor to continue as a dependent child, found the permanent plan of legal guardianship continued to be appropriate, and concluded it would not change its previous detriment finding made on September 29, 2020. It ordered that father have no visitation with the minor, but it allowed father, if he so chose, to submit correspondence to the minor through the social worker.[7]

---

[7] Father appealed the May 5, 2021 order after the six-month post-permanency planning review hearing. Deeming the appeal to have been abandoned by father, this court dismissed the appeal on September 20, 2021. (See *In re A.B.* H049078.) Therefore, we do not review the May 5, 2021 order here, although we present some detail

14

## I. Twelve-Month Post-Permanency Planning Review Hearing (Nov. 2021)

### 1. *Department's Report*

The Department reported that after delays due to staffing problems, the minor began to receive monthly visits from the assigned Alaska ICPC social worker. The minor had established relationships with medical and dental care providers; her physician had diagnosed the minor with post-traumatic stress disorder and sleeping difficulties. The minor had also established a relationship with a therapist, whom she had been seeing on a weekly basis since May 2021. The maternal grandmother reported that the new school year for the minor was going well. In September 2021, however, because of a statement the minor made, school officials made a suicide assessment and gave the minor the option to go home for the day. The minor was receiving emotional support from her school counselor.

In August, the minor told the Department's social worker "that she would like to see her father face consequences for his abusive behavior." In a November 2021 meeting to discuss the minor's needs, she told the social worker that she "would like her dependency case to remain open and she would like to see her father face consequences[,] specifically jail time[,] for his abusive behavior and for feeding her marijuana. She reported that he's abused other children and adults and 'he will not stop, he will keep abusing people' and he has 'caused so much harm.' She reported that the 'best case scenario would be that he goes to jail and I can visit him in jail.' [The minor] reported "I don't want to live in a world where he doesn't get punished.' [¶] While [the minor] would like her dad to have repercussions for his actions, she reported that she would also like to maintain a relationship with him and visit with him."

The Department reported that since the May 2021 hearing, notwithstanding the court's order permitting father to correspond with the minor in care of the social worker,

concerning those prior proceedings for purposes of giving background and context to the twelve-month post-permanency planning review hearing at issue in this appeal.

she had not had contact with father. In October, father did contact the social worker to see if he could arrange through social services to get a birthday present to the minor. The social worker advised in her report: "[The minor] has at times expressed a desire to see her father, partly to confront him about his abusive behavior. Most recently, [the minor] has told the undersigned she would like to have visitation with her father. [The minor's] therapist is aware of [her] desire to have a relationship with her father and is currently working with [the minor] to explore these feelings further to determine if it would be in [her] best interest to resume communication between [the minor] and her father."

The Department noted that the minor had had 10 different placements during the dependency proceedings. The Department reported that the maternal grandparents had provided a loving home for the minor, who enjoyed spending time with nearby relatives.

### 2. *CASA Worker Report*

Rosalie Hershberger, the minor's Court Appointed Special Advocate (CASA) worker since September 2018, reported that she had maintained contact with the minor by text, phone, and mail since her move to Alaska in June 2020. Hershberger advised that the minor spent considerable time with her nearby niece and nephew. The minor's closest relationship was with her adult half-sister. The minor regularly attended class, and she participated in a theater club in the summer. The minor had been seeing a therapist weekly, and Hershberger stated that the minor "seem[ed] to have connected with her."

In October 2021, Hershberger visited the minor in Alaska for her birthday. The minor showed Hershberger her room, which Hershberger said was tidy, well-decorated, "and most definitely hers and hers alone." They enjoyed an afternoon having lunch, shopping for books, and attending a movie. Hershberger stated the minor showed quick mood swings, "go[ing] from angry to silent and depressed in a flash." The minor was initially very happy but later began "talking about not wanting to live long. She'd say things like 'this might be my last birthday' and 'I may not make it to 18.' When

16

[Hershberger] asked her why[,] her answer was 'I don't want to live in a world where my dad is not in jail for what he's . . . done.' " In talking with the minor, Hershberger found that "it always [came] back to her dad not being in jail. At the same time, she want[ed] to visit him again."

Hershberger opined that the minor's placement with was very beneficial, and the maternal grandparents provided her a "safe, stable and loving home environment." Hershberger stated: "After seeing her bedroom and the way she takes pride and ownership of the space[,] it's easy to see this is where she needs to be. [The minor] is very lucky to have such caring and dedicated grandparents."

### 3. *Twelve-Month Review Hearing*

The court conducted a 12-month post-permanency review hearing on November 30, 2021. No testimony was presented. The court heard from counsel, and from the minor and father themselves.

The Department submitted the matter on its report. Counsel reiterated the Department's recommendation that the court continue dependency jurisdiction with the continued permanent plan of legal guardianship with the maternal grandparents, and that the court continue to deny visitation to father based upon the court's prior detriment finding.

The minor's counsel stated that the minor requested that some visitation be established. In an effort to accommodate that wish, counsel suggested that therapeutic visitation involving the social worker and the minor's therapist might be appropriate to provide safeguards for the visits. The minor, speaking on her own behalf, confirmed that she was requesting monthly visitation.

Father's counsel confirmed that her client would very much like monthly visitation as requested by the minor and a lifting of the court's prior detriment finding. Father's counsel provided the court with an e-mail sent by father the day before the hearing in which he disputed many of the statements made in the Department's report.

17

Father stated in the e-mail that he believed the Department was "pushing abuse, which did not occur, as a motive to keep my daughter from communicating with or seeing me." He stated further in the e-mail, in addressing the Department's comments that the minor wanted him in jail and on the other hand wanted a relationship with him: "She is obviously very confused and I know that most of her trauma in the last three years is mainly from being bounced from one home or institution to another where conditions were unacceptable and/or the other occupants were causing her stress." Father's counsel requested a contested hearing to address the report and visitation (if the court did not contemplate ordering it). The court ordered that the e-mail be scanned and made part of the record and would be deemed "parents' comments on the report."

The Department indicated its continued opposition to visitation, urging the court that while the minor's statements should be considered, the best interest of the minor was the standard. Counsel argued that it would not be appropriate to lift the prior finding of detriment without any evidence that circumstances had changed since the hearing in May 2021. She argued further that there had been no evidence of change in father's life, his taking parenting classes or receiving therapy, his taking advantage of the opportunity to send letters to the minor pursuant to the prior court order, or the existence of other changed circumstances to justify lifting the detriment finding. Counsel opposed setting a contested hearing on visitation, inquiring what offer of proof father might make showing a change in circumstances occurring since the May hearing that warranted lifting the detriment finding.

Father's counsel responded that a parent was not required to make an offer of proof in seeking a contested hearing, and, further, that there was no requirement of a showing of changed circumstances. Counsel incorporated father's e-mail in support of the request for visitation and stated that "he would testify to the Court that he has stability and support, a job, that he was extremely respectful about all restrictions upon him to have communications with his daughter. [¶] Further, he lives nearby . . . in the same

18

town. . . . [H]e has never crossed any line in that regard. He was nothing but respectful . . . to the court orders, respectful to his daughter, respectful to the family that cares for her."

The court concluded that father had made no preliminary showing warranting a contested hearing on visitation. It reasoned: "This Court made a detriment finding in . . . 2020 based on evidence that was presented at that time. The detriment finding was confirmed by a full[-]blown evidentiary testimonial hearing in May [2021]. The only thing that [father] has advanced for today's hearing . . . is an email that says we all got it wrong, that the social worker report is wrong, that the Court made the wrong decisions . . . . What would be the purpose of an evidentiary hearing other than a rehash of the evidence that the Court took in May and the fact that nothing bad has happened in the interim? He was accorded the opportunity to potentially commence visits in the form of written correspondence. He didn't even take advantage of that[,] and he at least needs to make a preliminary showing."

The juvenile court found that legal guardianship continued to be the appropriate permanent plan, with the minor remaining under the custody, care, and control of the Department placed with the maternal grandparents. Having previously found that visitation with father would be detrimental and thus not in the minor's best interests, the court ordered no visitation. It, however, indicated that father could submit correspondence to the social worker for potential submission to the minor.[8] The court denied father's request for a contested hearing. The court set a further post-permanency planning review hearing for May 24, 2022.

---

[8] At the request of the minor's counsel, the court indicated that the minor, working with her therapist and the social worker, could prepare a letter to father stating everything she wished to tell him for delivery by the social worker.

## II. DISCUSSION

### A. Applicable Law

#### 1. Dependency Proceedings

This case concerns proceedings occurring after the termination of reunification services and the selection of a permanent plan at a 366.26 hearing. Given that procedural context, we provide the following discussion of relevant dependency law.

As summarized by the First District Court of Appeal (Division 2): "Although the legislative scheme is somewhat labyrinthine, it is simple in basic concept. Its purpose is to balance efforts to reunify a parent with their child with the child's need for a stable, permanent home. [Citation.] 'The parent is given a reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority.' [Citation.] The critical juncture is when a hearing pursuant to Welfare and Institutions Code section 366.26 is set to determine a permanent plan of care for the dependent child . . . . '[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over the child's need for stability and permanency.' [Citation.] The reunification period may last as long as 18 months, and it may be yet another four months before the section 366.26 hearing is held. [Citation.] 'While this may not seem a long period of time to an adult, it can be a lifetime to a young child. Childhood does not wait for the parent to become adequate.' [Citation.] 'After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point, "the focus shifts to the needs of the child for permanency and stability" [citation], and in fact, there is a rebuttable presumption [pending the adoption of a permanent plan] that continued foster care is in the best interests of the child.' [Citation.]" (*In re C.W.* (2019) 33 Cal.App.5th 835, 839, fns. omitted.)

The exclusive procedure for establishing the permanent plan for the child is the selection and implementation hearing as provided under section 366.26. The essential

20

purpose of the hearing is for the court "to provide stable, permanent homes for these children." (*Id*., subd. (b).) "At the section 366.26 hearing, the question before the court is decidedly not whether the parent may resume custody of the child. [Citations.] In fact, it is not permissible to order reunification at the section 366.26 hearing. [Citations.] Indeed, when the court orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved. [Citation.]" (*In re Caden C*. (2021) 11 Cal.5th 614, 630.)

There are seven statutory choices for the permanency plan; the preferred choice is adoption, coupled with an order terminating parental rights. (§ 366.26, subd. (b); see also *In re Celine R*. (2003) 31 Cal.4th 45, 53 ["Legislature has thus determined that, where possible, adoption is the first choice"].) The court selects this option if it "determines . . . by a clear and convincing standard, that it is likely the child will be adopted." (§ 366.26, subd. (c)(1).) The next preferred choice (if the Indian Child Welfare Act does not apply) is relative legal guardianship. (§ 366.26, subd. (b)(3).) The last-preferred choice, which is "therefore disfavored" (*In re C.W*., *supra*, 33 Cal.App.5th at p. 840), is long-term foster care. (§ 366.26, subd. (b)(7).)

After the juvenile court has selected a permanent plan at the 366.26 hearing, it must conduct periodic reviews under section 366.3. (*In re C.W*., *supra*, 33 Cal.App.5th at p. 840.) "If the permanent plan is either for adoption or guardianship, that statute calls for the juvenile court to retain jurisdiction until either step is accomplished, and to review the child's status every six months to ensure that the plan 'is completed as expeditiously as possible.' (§ 366.3, subd. (a).) For all other children (i.e., those who have neither been ordered placed for adoption nor with a legal guardian), section 366.3 specifies that 'the status of the child shall be reviewed at least every six months' (*id*., subd. (d)) in order to inquire into 'the progress being made to provide a permanent home for the child,' which inquiry also 'shall consider the safety of the child' (*id*., subd. (e))." (*Ibid.*)

## 2. *Standard of Review*

Father makes two basic contentions on appeal. First, he contends that the juvenile court was required under section 366.3 to grant his request for a contested 12-month post-permanency review hearing. Such matters of statutory interpretation are issues of law that are reviewed de novo. (*In re J.F.* (2011) 196 Cal.App.4th 321, 329 (*J.F.*).) Second, father asserts that he had a constitutional right to due process under the Fifth and Fourteenth Amendments to a contested post-permanency review hearing, and the court could not condition such right upon his making an offer of proof. Such a due process contention is likewise an issue of law for which the de novo standard of review applies. (*In re A.B.* (2014) 230 Cal.App.4th 1420, 1434.)

## B. Claimed Error in Denial of Contested Hearing on Visitation

### 1. *Statutory Right to Contested Hearing*

Father contends that under section 366.3, he was entitled to notice and an opportunity to participate at the 12-month post-permanency hearing. He argues that such right to participate included the right to a contested hearing that was unfettered by the requirement that he submit an offer of proof justifying such hearing. He relies on a trio of cases decided at the post-permanency stage: *In re Kelly D.* (2000) 82 Cal.App.4th 433 (*Kelly D.*), *In re Josiah S.* (2002) 102 Cal.App.4th 403 (*Josiah S.*), and *J.F.*, *supra*, 196 Cal.App.4th 321.

In *Kelly D.*, *supra*, 82 Cal.App.4th at page 435, the juvenile court ordered long-term foster care as the permanent plan for the three dependent children. At a post-permanency review hearing, the agency (having not made the proposal in the social worker's report) recommended a reduction in visitation; the father objected to the lack of notice of the proposed change and requested a contested hearing. (*Id.* at p. 436.) The juvenile court granted the agency's request to modify the visitation schedule, concluding that the father had no right to a contested hearing. (*Ibid.*) The appellate court reversed, holding that "subdivision (e) of section 366.3 expressly entitles the parents of a minor in

22

long-term foster care to notice of and participation in the six-month [post-permanency] status review hearing. 'Notice' of that hearing must include notice to the parent of any proposed departmental modifications to existing juvenile court orders. Moreover, to 'participate' in the hearing connotes involvement as a party to the proceeding, one essential aspect of which is the reasonable expectation that parents could challenge departmental proposals and proposed court modifications." (*Id.* at p. 438.)[9] The *Kelly D.* court's conclusion was based in part upon the requirement under section 366.3, subdivision (e) that "the juvenile court . . . review the adequacy of services provided to the minor, consider the minor's safety, *and* assess the progress the *parents* have made toward mitigating the causes necessitating placement in foster care. [Citation.]" (*Kelly D.*, *supra*, at p. 438.) The court reasoned that because the statute gave the parent the opportunity to show that additional steps toward reunification may promote the dependent child's best interests and it was possible that the parent and child in long-term foster care might reunify, the parent was entitled under the statute to have a contested review hearing. (*Ibid.*)

*Kelly D.*, *supra*, 82 Cal.App.4th 433 does not support father's claim of error. The court's conclusion that the father in *Kelly D.* was entitled to a contested post-permanency review hearing was based upon "the express language of subdivision (e) of section 366.3." (*Id.* at 440.)[10] That statutory provision applies to review hearings

___

[9] The relevant language relied on and quoted by *Kelly D.* concerning the rights of a parent of a child in long-term foster care at post-permanency review hearings was the version of section 366.3, subdivision (e) then in effect. It read as follows: " 'Unless their parental rights have been permanently terminated, *the parent or parents of the child are entitled to receive notice of, and participate in, those hearings.*' " (*Kelly D.*, *supra*, 82 Cal.App.4th at p. 437, fn. 3, original italics.) That identical language is found in the current version of section 366.3 in subdivision (f).

[10] Subdivision (e) of section 366.3 provides in part: "[A]t the review held every six months pursuant to subdivision (d), the reviewing body shall inquire about the progress being made to provide a permanent home for the child, shall consider the safety of the child, and shall determine all of the following: [¶] (1) The continuing necessity

23

involving dependent children whose permanent plan is long-term foster care. (*In re C.W.*, *supra*, 33 Cal.App.5th at p. 840.) Because subdivision (e) refers to "the review held every six months pursuant to subdivision (d)," and subdivision (d)(1) requires status review hearings at least every six months for a child who "is in a placement *other than the home of a legal guardian*" (italics added), the provision expressly does *not* apply to the post-permanency review hearing involving the minor here. Section 366.3, subdivision (a)(1) is the provision applicable where the dependent child's permanent placement is with a legal guardian. (*In re C.W.*, *supra*, 33 Cal.App.5th at p. 840.)[11] That statute does not contain the language then found in subdivision (e) and now found in subdivision (f)—that "the parent or parents of the child are entitled to receive notice of, and participate in, those hearings"—upon which the *Kelly D.* court relied.

In *Josiah S.*, *supra*, 102 Cal.App.4th at page 409, the court ordered long-term foster care as the permanent plan of the dependent child. After receipt of an interim review report by the agency that included a recommendation to curtail visitation,

---

for, and appropriateness of, the placement . . . . [¶] . . . [¶] (3) The continuing appropriateness and extent of compliance with the permanent plan for the child . . . . [¶] (4) The extent of the agency's compliance with the child welfare services case plan in making reasonable efforts either to return the child to the safe home of the parent or to complete whatever steps are necessary to finalize the permanent placement of the child. . . . [¶] . . . [¶] (7) The extent of progress the parents or legal guardians have made toward alleviating or mitigating the causes necessitating placement in foster care." *Expressly excluded* from the review hearings required under subdivision (e) are cases in which the child's permanent plan involves placement with a legal guardian. (§ 366.3, subd. (d)(1) ["[i]f the child . . . is in a placement other than the home of a legal guardian and jurisdiction has not been dismissed, the status of the child shall be reviewed at least every six months"].)

[11] "If a juvenile court orders a permanent plan of adoption, tribal customary adoption, adoption of a nonminor dependent . . . or legal guardianship . . . , the court shall retain jurisdiction over the child or nonminor dependent until the child or nonminor dependent is adopted or the legal guardianship is established, . . . . The status of the child or nonminor dependent shall be reviewed every six months to ensure that the adoption or legal guardianship is completed as expeditiously as possible." (§ 366.3, subd. (a)(1).)

mother's counsel filed an objection and requested a contested hearing on the report's contents, which request was denied by the juvenile court. (*Id.* at pp. 414-415.) The appellate court reversed. Relying extensively on *Kelly D.*, 82 Cal.App.4th at pages 438 to 440, the court in *Josiah S.* held that the mother was entitled to a contested post-permanency hearing because under then-subdivision (e) of section 366.3, the parent of a child placed in long-term foster care has the right to notice and participation at such hearings. (*Josiah S.*, *supra*, at pp. 416-417.) The court's decision in *Josiah S.*, like *Kelly D.*, was based upon a statute inapplicable to the proceedings here.

In *J.F.*, *supra*, 196 Cal.App.4th at page 328, long-term foster care was selected by the juvenile court as the permanent plan for child. At the 12-month post-permanency hearing, the mother disputed the agency's report and requested a contested hearing concerning matters related to the child's potential return to her care. (*Ibid.*) The juvenile court required that the mother present an offer of proof and then concluded that the offer was not sufficient to warrant a contested hearing. (*Ibid.*)

The appellate court in *J.F.*—reciting the same "notice . . . and participate" language of section 366.3 relied on by the courts in *Kelly D.* and *Josiah S.*[12]—concluded that the statute grants the parent of a dependent child whose permanent plan is long term foster care "the right to take part in the post-permanency review and anticipates the parent may present evidence to overcome the presumption continued foster care is in the child's best interests." (*J.F.*, *supra*, 196 Cal.App.4th at p. 331.) In so concluding, the court held that the statute did not condition the right to participate at such review hearings upon the parent's making an offer of proof. (*Ibid.*) Further, the court in *J.F.* emphasized that section 366.3 treated differently cases in which the child's permanent plan was long-

---

[12] After *Kelly D.* and *Josiah S.* were decided, the statutory language formerly under subdivision (e) that "the child's parent is 'entitled to receive notice of, and participate in, those [post-permanency review] hearings' " (*J.F.*, *supra*, 196 Cal.App.4th at p. 330) had been recodified under subdivision (f) of section 366.3. (See stats. 2008, ch. 482, § 7.)

25

term foster care: "The Legislature recognizes that a placement in long-term foster care is not necessarily a stable placement and directs the court to hold periodic reviews to consider all permanency plan options for the child, including returning the child to the parent's home. [Citations.] . . . A dependent child has a compelling interest in a placement that is more permanent than long-term foster care, which is the least favored permanency plan. [Citation.] The Legislature directs the court to consider all permanency placement options for a child in long-term foster care, including return to the parent's home. (§ 366.3, subd. (h).)" (*J.F.*, *supra*, at p. 334, fn. omitted.) The court in *J.F.* therefore reversed, holding that both section 366.3 and the right to due process afforded "the parent of a child in long-term foster care the right to participate in the post-permanency review, without conditioning that right on an offer of proof. [Citations.]" (*Id.* at pp. 335-336.)

*J.F.*, *supra*, 196 Cal.App.4th 321 offers no support for father's position here. Subdivisions (e), (f) and (h) of section 366.3, relied on by the *J.F.* court, concerning post-permanency review of cases in which the dependent child's permanent plan is long-term foster care, have no application to the post-permanency review hearing for the minor in this case whose permanent plan was legal guardianship. Further, as the *J.F.* court noted, the statutory provisions at issue there focused on the disfavored option of long-term foster care and the importance of the post-permanency review process in accomplishing more stable placement for the child, including his or her possible return to the parent's home. (*Id.*, at p. 334.)

Father argues that, notwithstanding the fact that *Kelly D.*, *Josiah S.*, and *J.F.* concerned review of long-term foster care placements under subdivision (e) of section 366.3, the principles enunciated in those cases nonetheless apply here because subdivision (f) of the statute provides: "Unless their parental rights have been permanently terminated, the parent or parents of the child are entitled to receive notice of, and participate in, those hearings." He asserts that "those hearings" referred to in

26

subdivision (f) of the statute includes permanency plan review hearings required every six months under subdivision (a)(1) where the permanent plan of legal guardianship has been ordered. Based upon this assertion, father concludes that cases holding that parents of children in long-term foster care have an unfettered right to a contested post-permanency review hearing apply equally to this legal guardianship case. We disagree for four reasons.

First, subdivision (a)(1) creates one category of post-permanency review hearings specifically for cases in which the permanent plan selected is either "adoption, tribal customary adoption, adoption of a nonminor dependent . . . , or legal guardianship." Section 366.3, subdivision (d)(1) is the provision addressing cases in which the permanent plan is long-term foster care. (See § 366.3, subd. (d)(1) ["[i]f the child or nonminor dependent is in a placement other than the home of a legal guardian and jurisdiction has not been dismissed, the status of the child shall be reviewed at least every six months"]; see also *J.F.*, *supra*, 196 Cal.App.4th at p. 330 [noting that subdivision (d)'s requirement of status review hearings every six months applies where long-term foster care is permanent plan].)

Second, there is no reference in subdivision (f) of section 366.3 to the post-permanency review hearings provided for under subdivision (a)(1).

Third, clearly, subdivision (e) (which specifically refers back to subdivision (d)) and subdivision (f) of section 366.3 both relate to cases in which the permanent plan selected is long-term foster care. (See *J.F.*, *supra*, 196 Cal.App.4th at p. 331 ["by its plain language, section 366.3, subdivision (f), grants the parent the right to take part in the post-permanency review and anticipates the parent may present evidence to overcome the presumption continued foster care is in the child's best interests"].)

Fourth, father's claim that the phrase "those hearings" in subdivision (f) is intended to include post-permanency review hearings involving legal guardianship does not survive close scrutiny. We so conclude by tracing the origin of the sentence in

question.  The sentence was contained in section 366.3, as originally enacted in 1987 (becoming effective in 1989).  The sentence appeared in the last paragraph of then-subdivision (c), which concerned review hearings for a minor "in a placement other than a preadoptive home or the home of a legal guardian."  (Stats. 1987, ch. 1485, § 49.)  In a 1995 amendment, then-subdivision (c) became subdivision (d).  (See stats. 1995, ch. 540, § 9.)  In another amendment the next year, then-subdivision (d) became subdivision (e).  (See Stats. 1996, ch. 1138, § 5.)  In both the 1995 and 1996 amendments, the last paragraph included the notice and participation sentence at issue here.  And, after numerous subsequent amendments to section 366.3, in 2008, the statute was again amended.  The 2008 amendment effectively splintered the last paragraph of subdivision (e)—that included the sentence at issue here, reading " . . . the parent or parents of the child are entitled to receive notice of, and participate in, those hearings"— from subdivision (e) to create a new subdivision (f).  (See Stats. 2008, ch. 482, § 7.)  From this history, it is clear that "those hearings" to which parents are entitled to receive notice and in which they are entitled to participate (§ 366.3, subd. (f)), are hearings involving long-term foster care cases; the language has no application to cases in which legal guardianship has been selected as the permanent plan.

Accordingly, we find no merit to father's contention that the juvenile court's denial of a contested post-permanency review hearing was a deprivation of his statutory rights under section 366.3.

### 2. *Due Process Right to Contested Hearing*

#### a. **Applicable Law**

Parents enjoy a fundamental liberty interest in the care, custody, and management of their children.  (*Santosky v. Kramer* (1982) 455 U.S. 745, 753.)  "The state and federal Constitutions guarantee no state shall deprive parents of this interest in their children without due process of law, which includes the right to confront and cross-examine witnesses in dependency proceedings.  [Citations.]"  (*David B. v. Superior Court* (2006)

28

140 Cal.App.4th 772, 777 (*David B.*).) In the context of dependency proceedings, however, "due process is not synonymous with full-fledged cross-examination rights. [Citation.] Due process is a flexible concept which depends upon the circumstances and a balancing of various factors. [Citation.]" (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 817 (*Jeanette V.*).) "The essential characteristic of due process in the statutory dependency scheme is fairness in the procedure employed by the state to adjudicate a parent's rights. [Citation.]" (*In re James Q.* (2000) 81 Cal.App.4th 255, 265 (*James Q.*).)

Because due process " 'is a flexible concept' . . . [e]ven where due process rights are triggered, it must always be determined 'what process is due.' [Citation.] We look to 'the private interest that will be affected by the agency's action, the risk of an erroneous deprivation of that interest, the interest in informing parents of the basis for and consequences of the action and in enabling them to present their side of the story, and the agency's interest in expeditious decisionmaking as affected by the burden caused by an additional procedural requirement.' [Citation.]" (*In re A.B.*, *supra*, 230 Cal.App.4th at p. 1436.)

Thus, for example, courts have rejected due process challenges to the juvenile court's requiring an offer of proof by parents in support of the parental benefit relationship exception to adoption under section 366.26. (See *In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122 (*Tamika T.*); *Jeanette V.*, *supra*, 68 Cal.App.4th at pp. 816-817; see also *In re Earl L.* (2004) 121 Cal.App.4th 1050, 1053 [juvenile court properly required parent to make offer of proof on claim of sibling relationship exception to adoption].) Additionally, one court has held that the juvenile court, without offending due process, may require a parent seeking a post-permanency contested hearing to submit an offer of proof on whether the child placed in long-term foster care should return home. (*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1146-1148; but see *J.F.*, *supra*, 196 Cal.App.4th at pp. 332-333 [disagreeing with *Maricela C.*].) In contrast, the juvenile court cannot require the parent to submit an offer of proof to challenge the

agency's claim at a 366.26 hearing that it is likely that a child will be adopted: "The critical difference between this case and the *Tamika T.* and *Earl L.* line of authority is that the courts permit offers of proof on issues where the parent has the burden of proof, . . . while the contested factual issue in this case is [one] which the Department has the burden of proving." (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 732 (*Thomas R.*); see also *James Q.*, *supra*, 81 Cal.App.4th at pp. 266-268 [conditioning parent's request for contested six-month review hearing on parent's offer of proof and terminating reunification services after denial of hearing deprived parent of due process].)

An important consideration in resolving father's due process claim here is the fact that the dependency proceeding here is in the post-permanency stage. As explained by one court, a "factor bearing on the right to a contested hearing is the stage of the dependency proceeding, which is closely tied to the issue of which party has the burden of proof. 'Different levels of due process protection apply at different stages of dependency proceedings. [Citations.]' [Citation.] In the initial phases of a dependency proceeding, family preservation is the primary focus and the ' "parent's interest in reunification is given precedence over the child's need for stability and permanency." [Citation.]' [Citation.] 'However, "[o]nce reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability." [Citation.]' [Citation.]" (*M.T. v. Superior Court* (2009) 178 Cal.App.4th 1170, 1181 (*M.T.*); see also *David B.*, *supra*, 140 Cal.App.4th at p. 778 [18-month pre-permanency review hearing "marks a critical turning point in the proceedings from a focus on family reunification to finding a permanent and stable placement for the child"].)

### b.    Claim of Error

The circumstances presented here as detailed above did not compel the juvenile court, under principles of due process, to grant father's request for a contested post-permanency 12-month review hearing. In the three-plus years since the minor had been detained, she had had 10 placements. At the time of the hearing in November 2021, the

minor, then 15 years old, had been living with the legal guardians, her maternal grandparents, for 18 months, by far the longest placement during these proceedings. The Department reported that the legal guardians had provided a loving home for the minor, who enjoyed spending time with nearby relatives. CASA worker Hershberger confirmed that the minor was in a "safe, stable and loving home environment," and that the minor was "very lucky" to be in her present placement. After moving to Alaska, the minor had established relationships with medical and dental care providers, had established a relationship with a therapist whom she was seeing weekly, was doing well in school (after a history during dependency of poor attendance), and had support from a school counselor.

Notwithstanding the increased stability of the minor's home environment, there were concerns about her mental health that centered around her relationship with, and attitude toward, father. At the six-month permanency hearing in May 2021, the minor, through her in-chambers testimony, exhibited significant anger toward father, about his referring to her during the hearing as "his property," and with how he treated her. She stated she wanted no part of living with him; believed he was not a stable father; believed he was not (as he claimed) in a stable relationship; and felt he was trying to bribe her to regain custody, which she found "just repulsive." As of November 2021, the minor had made repeated statements to the Department and to CASA worker Hershberger that she wanted to see father in jail. The minor nonetheless said she would like to visit him. The Department reported that in September 2021, the minor expressed suicidal ideation. And in late October during their visit CASA worker Hershberger reported that the minor was emotionally volatile, said she did not want to live long, and said she did not want to live in a world where father was not in jail for what he had done.

The record showed that father had a history of problems during visitation, telephone calls, and other communications with the minor, specifically, inappropriate communications with the minor and a lack of respect for verbal boundaries, disregard of

31

visitation staff's requests and direction, and aggressive attitude toward group home placement staff. The inappropriate communications included negative comments about mother and her family, negative comments about the minor's placements, discussion of the dependency proceedings, criticisms of case workers and staff, discussion of filing lawsuits and initiating federal investigations related to the dependency, telling the minor she had been kidnapped and needed to be rescued, undermining placement's efforts to get the minor to attend school, and instructing the minor not to attend medical and dental appointments.

After initially finding in September 2020 at the 366.26 hearing that visitation would be detrimental to the minor, the juvenile court, at the May 2021 six-month post-permanency review hearing, heard testimony and argument concerning father's request for visitation and the Department's recommendation to extend the detriment finding.[13] The court reaffirmed the detriment finding and denied visitation but permitted contact by father with the minor by correspondence submitted through the social worker. The court provided a detailed statement of its reasons. It noted that it was very surprised that father had "completely dropped out of any involvement or participation with his daughter after November of 2019," emphasizing that there had been a number of court appearances in which father's counsel had stated she had had no communication with her client.[14] The court also found troubling father's reference to the minor as "his property" both at the hearing an in a prior unreported proceeding. It stated that father's previous reported

_____

[13] The juvenile judge who made the detriment finding at the 366.26 hearing in September 2020 was also the judge at the subsequent six-month and twelve-month post-permanency review hearings in May 2021 and November 2021, respectively.

[14] As of the first date scheduled for the six-month post-permanency hearing in March 2021 (which father did attend), he had not personally appeared in court for 19 months. His last personal appearance was at the June 2019 six-month review hearing. Father did not attend several hearings at critical stages of the proceedings: He failed to attend the 12-month review hearing in December 2019; the 18-month review hearing in March 2020; or the 366.26 hearings in July and September 2020.

contacts with Promesa staff were "repeated, inappropriate, and inexcusable behavior." The court concluded after the contested six-month post-permanency review hearing: "[I]t's not access to horses or a nice property or a waterfall that needed to be addressed by [father], it's behavioral and therapeutic. And he has not brought forth . . . one scintilla of evidence that he has attempted to do any of those things since he disappeared in November of 2019 until only recently reemerging."

The Department, for the 12-month review hearing, recommended a continuation of the dependency with legal guardians remaining the permanent placement. It did not seek a modification of the order at the six-month post-permanency hearing. Father did not, either through counsel or through his e-mail, raise anything new in support of his request for visitation. Father did not identify any steps he had taken to address past issues identified during the dependency, such as addressing anger management, participating in therapy, or acknowledging past behaviors during visitation and other contacts with the minor that had been inappropriate and emotionally destabilizing for the minor. These steps, not taken, included various efforts that the Department identified in opposing visitation at the six-month post-permanency hearing in May 2021. Rather than identifying efforts that suggested that significant problems had been addressed, father's November 2021 e-mail (1) identified claimed errors in the Department's report; (2) denied issues that had resulted in the minor's detention in August 2018; (3) alleged improper conduct by the Department, including its "pushing abuse . . . to keep [his] daughter from communicating with or seeing [him]"; and (4) posited that the minor's past trauma was the result of her many placements (and, by implication, denying any personal responsibility for that trauma).

The juvenile court, in denying father's request for visitation or a contested 12-month review hearing, observed that it had previously made a detriment finding in 2020, and had confirmed that finding in "a full[-]blown evidentiary testimonial hearing in May [2021]." The court noted further that father's e-mail had not advanced anything

33

concerning his request for visitation other than "we all got it wrong."  The juvenile court also stated that father had not "even taken advantage of" the opportunity, provided after the six-month review hearing in May 2021, to visit with the minor through correspondence.

Under the circumstances, the juvenile court's denial of father's request for a contested review hearing did not deprive him of due process.  Although parents in dependency proceedings have a right to due process, that right "is not synonymous with full-fledged cross-examination rights.  [Citation.]  Due process is a flexible concept which depends upon the circumstances and a balancing of various factors.  [Citation.]" (*Jeanette V.*, *supra*, 68 Cal.App.4th at p. 817.)  As has been observed (a point critical to the analysis of father's claim of error here), "[d]ifferent levels of due process protection apply at different stages of dependency proceedings.  [Citations.]" (*Thomas R.*, *supra*, 145 Cal.App.4th at p. 733.)  Up until a 366.26 hearing is set, dependency law emphasizes reunification of the parent and child (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310 (*Marilyn H.*)), but "[o]nce reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability" (*id*. at p. 309).

Accordingly, "cases holding that a parent has an unfettered due process right to confront and cross-examine adverse witnesses at review hearings held before the permanency planning stage do not compel the identical conclusion with respect to hearings held after reunification services are terminated.  [Citations.]" (*M.T.*, *supra*, 178 Cal.App.4th at p. 1181.)  The court in *J.F.*, *supra*, 196 Cal.App.4th at page 333—a case relied on by father here—acknowledged this general proposition.  Although the *J.F.* court declined to follow the reasoning in *M.T.*, *supra*, at page 1181 to find it appropriate to require the parent of a child in long-term foster care to make an offer of proof to obtain a contested post-permanency review hearing, the *J.F.* court held:  "*Although this general proposition applies to post-permanency reviews for a child who is placed in a guardianship* or who has been freed for adoption, the interests of a child in long-term

foster care and those of his or her parent are not commensurate with those cases and merit closer scrutiny." (*J.F.*, supra, at p. 333, italics added.)

Here, it must be emphasized that the minor's permanent plan was legal guardianship, not long-term foster care where the statutory scheme for post-permanency review hearings permits the juvenile court to "order another six-month period of reunification services if the parent proves by a preponderance of the evidence that further efforts at reunification are the best alternative for the child . . . [and] also imposes on the court the obligation to review statutorily-specified factors concerning the child's circumstances and to consider all permanency options for the child, including return to the parent's home. " (*J.F.*, *supra*, 196 Cal.App.4th at p. 327.) Further, unlike the circumstances in the long-term foster care cases relied on by father in which the agency proposed action or changes adverse to the parent, the Department here recommended that the status quo from the prior review hearing be maintained. (See *J.F.*, *supra*, 196 Cal.App.4th at p. 328 [agency in report recited that child did not want to visit mother and she had not tried to see him, matters mother wished to contest]; *Josiah S.*, *supra*, 102 Cal.App.4th at p. 414 [agency in report sought restriction of mother's visitation to one-hour monthly visits]; *Kelly D.*, *supra*, 82 Cal.App.4th at p. 436 [agency requested at hearing a reduction in frequency of father's visitation, a matter not recommended in its report].) Moreover—also unlike the three long-term foster care cases on which father relies—the question of visitation (and the potential reversal of the previous detriment finding) identified by father at the 12-month review post-permanency hearing had been the subject of a contested evidentiary hearing six months earlier.

Furthermore, the juvenile court's denial of father's request for a new contested hearing concerning visitation must be viewed in the context of the case and the focus of the court at the post-permanency stage of the proceedings. The minor had undergone the instability of 10 placements during the dependency. She had finally achieved some stability in her current placement with her grandparents. There were, however, still

35

significant concerns reported by the Department and CASA worker Hershberger about the minor's emotional stability. The likely stress and pressures imposed upon the minor from a second contested evidentiary hearing within six months were important considerations for the court in light of its focus at this stage of the dependency proceeding being "the needs of the child for permanency and stability." (*Marilyn H.*, *supra*, 5 Cal.4th at p. 309; cf. *In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1089 [recognizing court's authority in an appropriate case to decline compelling child witness to testify, based upon "a recognition of the overriding objective of the dependency hearing—to preserve and promote the best interests of the child"].)

As was true in *M.T.* (albeit it being a long-term foster care case), "[i]t is plainly not the case that a parent may insist upon an evidentiary hearing at every post-permanency review, irrespective of the nature of the parent's objection to the social service agency's recommendations." (*M.T.*, *supra*, 178 Cal.App.4th at p. 1181.) Here, the juvenile court's denial of father's request for a contested hearing, after considering the evidence he proposed to put forward at such hearing and rejecting that offer of proof as inadequate, did not abridge father's right to due process.[15] In so ruling, the juvenile court respected

_____

[15] The juvenile court did not specifically state that it was requiring father to submit an offer of proof in support of his request for a contested hearing. Counsel for the Department, however, requested that father submit an offer of proof supporting his belief that there had been a change of circumstances since the prior contested six-month hearing to warrant ordering visitation. Father's counsel responded that father was not required to make an offer of proof, but counsel then referred to father's e-mail and made an offer of proof as to his anticipated testimony. Shortly after this colloquy, the court stated that it agreed with the Department's counsel, it had reviewed the matters presented by father's counsel and in father's e-mail, indicated that it had read and considered the evidence, and concluded that a new evidentiary hearing would be nothing more than a rehash of the evidence presented at the prior hearing. In the course of making its ruling, the court stated "[father] at least needs to make a preliminary showing." The court denied father's request for a contested hearing. We infer from this record that the juvenile court implicitly required father to submit an offer of proof, father's counsel made such offer, and the court, after considering it, concluded that it was insufficient to justify granting an evidentiary hearing. Although father does not specifically argue on appeal that his offer

"[t]he essential characteristic of due process . . . [of] fairness in the procedure employed by the state to adjudicate a parent's rights. [Citation.]" (*James Q.*, *supra*, 81 Cal.App.4th at p. 265.) Accordingly, the denial of father's request for a contested 12-month post-permanency review hearing was not constitutional error.

### III.   DISPOSITION

The November 30, 2021 order after the 12-month post-permanency review hearing is affirmed.

---

of proof was sufficient to warrant granting an evidentiary hearing—instead, asserting that he had the unfettered right to such a hearing—we conclude that father's offer of proof failed to meet the standard that such a proffer "must be adequate in scope and must be specific." (*In re A.G.* (2020) 58 Cal.App.5th 973, 982.)

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
DANNER, P.J.

_____
WILSON, J.

*In re A.B.; HSD v. G.B.*
**H049676**

Trial Court:                                          Santa Cruz County
                                                      Superior Court Nos.:  18JU00208


Trial Judge:                                          The Honorable Timothy J. Schmal


Attorney for Defendant and Appellant                 Michael C. Sampson
G.B.                          :                      under appointment by the Court of
                                                     Appeal for Appellant


Attorneys for Plaintiff and Respondent               Jason M. Heath,
Santa Cruz County HSD/Family and                     County Counsel
Children's Service:
                                                     Shannon Sullivan,
                                                     Deputy County Counsel


*In re A.B.; HSD v. G.B.*
**H049676**